# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

WYATT BURY, LLC, *et al.*,    )
        )
        PLAINTIFFS,    )
        )    CASE NO. 4:25-cv-00084-JAM
VS.    )
        )
CITY OF KANSAS CITY, MISSOURI,    )
*et al.*,    )
        )
        DEFENDANTS.    )

## BRIEF OF *AMICUS CURIAE* PROMO

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES.......................................................................................... ii

INTRODUCTION ........................................................................................................... 1

INTEREST OF AMICUS CURIAE................................................................................ 4

BACKGROUND ............................................................................................................. 5

I.      ARGUMENT ......................................................................................................... 7

        A. Therapy that Attempts to Change Sexual Orientation or Gender Identity Puts
           Minors at Risk of Serious Harm ................................................................... 7

        B. *NIFLA* Confirms That Governments May Regulate Medical Treatment to Protect
           Public Health and Safety .............................................................................. 12

        C. The Ordinances Are a Constitutionally Permissible Regulation of Licensed Health
           Professionals' Administration of a Particular Medical Treatment........................... 144

        D. Governments Have Long Regulated Health Professionals' Compliance With
           Standards Of Care, Including When Such Standards Are Violated By Treatment
           Delivered Through Verbal Communication ........................................................ 17

CONCLUSION ............................................................................................................... 21

KC 24274970.5

# TABLE OF AUTHORITIES

**Page(s)**

**Case Law**

*Ballou v. Prescott*,
    64 Me. 305 (1874)..........................................................................................................20

*Catholic Charities of Jackson v. Whitmer*,
    No. 1:24-CV-718, 2025 WL 369743 (W.D. Mich. Jan. 28, 2025).........................................15

*Chiles v. Salazar*,
    116 F.4th 1178 (10th Cir. 2024) ............................................................... *passim*

*Collins v. State of Tex.*,
    223 U.S. 288, 32 S. Ct. 286, 56 L. Ed. 439 (1912) ........................................................20

*Crane v. Johnson*,
    242 U.S. 339 (1917)..........................................................................................................20

*Dent v. West Virginia*,
    129 U.S. 114 (1889)..........................................................................................................20

*Doyle v. Hogan*,
    411 F. Supp. 3d 337 (D. Md. 2019) ...............................................................................7, 15

*Fowler v. Sergeant*,
    1 Grant 355 (Pa. 1856).....................................................................................................19

*Graham v. Gautier*,
    21 Tex. 111 (1858)............................................................................................................19

*King v. Governor of New Jersey*,
    767 F.3d 216 (3d Cir. 2014).............................................................................................7, 15

*National Institute of Family and Life Advocates v. Becerra*,
    585 U.S. 755 (2018)............................................................................................... *passim*

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)...........................................................................................................5

*Otto v. City of Boca Raton*,
    41 F.4th 1271 (11th Cir. 2022) .........................................................................................21

ii

*Otto v. City of Boca Raton*,
　981 F.3d 854 (11th Cir. 2020) ............................................................15

*Pickup v. Brown*,
　740 F.3d 1208 (9th Cir 2014) ...............................................14, 15, 17

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
　505 U.S. 833 (1992)............................................................13, 14, 16

*Telescope Media Grp. v. Lucero*,
　936 F.3d 740 (8th Cir. 2019) ..............................................................14

*Tingley v. Ferguson*,
　47 F.4th 1055 (9th Cir. 2022) ........................................................ *passim*

*Watson v. Maryland*,
　218 U.S. 173 (1910)...........................................................................20

*Welch v. Brown*,
　834 F.3d 1041 (9th Cir. 2016) ............................................................7

**Constitutional Provisions**

U.S. Const. amend. I ...................................................................... *passim*

**Other Authorities**

Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts* 2
　(Feb. 2021) .................................................................................. *passim*

Am. Psychological Ass'n, *APA Resolution on Sexual Orientation Change Efforts* 5
　(Feb. 2021) ......................................................................6, 8, 11, 12

Am. Psychological Ass'n, *Report of the American Psychological Association
　Task Force on Appropriate Therapeutic Responses to Sexual Orientation*
　83 (2009).........................................................................................9

Caitlin Ryan et al., *Parent- Initiated Sexual Orientation Change Efforts with LGBT
　Adolescents: Implications for Young Adult Mental Health and Adjustment* ............................7

George J. Annas, *Doctors, Patients, and Lawyers — Two Centuries of Health
　Law*, 367 New Eng. J. Med. 445 (2012) .........................................................18

KC 24274970.5

Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, JAMA Psychiatry (Sept. 11, 2019) ...................10

Nguyen K. Tran et al.*, Conversion practice recall and mental health symptoms in sexual and gender minority adults in the USA: a cross-sectional study*, 11 Lancet Psychiatry 879 (2024) ..............................................................11

Nissa M. Strottman, *Public Health and Private Medicine: Regulation in Colonial and Early National America*, 50 Hastings L.J. 383, 387 (1999) ...................................... 19-20

U.S. Dep't of Health and Human Servs., Substance Abuse and Mental Health Serv. Admin.*, Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* (2015)......................................................................................................................................9

U.S. Dep't of Health and Human Servs., Substance Abuse and Mental Health Serv. Admin.*, Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth* 9 (2023)..................................................................................5, 6

3 William Blackstone, Commentaries on the Laws of England, 8, p. 122 (1772)...............................................................................................................................19, 20

iv

## INTRODUCTION

*Amicus curiae* PROMO respectfully submits this brief to assist the Court's consideration of Plaintiffs' motion for preliminary injunction and Defendants' motion to dismiss.[1] PROMO is Missouri's LGBTQ+ public policy and advocacy organization defending the community's rights and fighting to expand protections for more than 35 years. PROMO has a strong interest in this case because the population it serves—including Kansas City and Jackson County's LGBTQ+ youth and their parents—are the very persons at risk of being subjected to the harmful practice of conversion therapy.

For more than a decade, the federal courts, including multiple federal courts of appeals, have repeatedly upheld laws protecting minors from the well-documented harms of "treatments" that seek to change a person's sexual orientation or gender identity. With the sole exception of the Eleventh Circuit's outlier opinion, appellate decisions have continued to hold that these laws do not violate the First Amendment's speech or religion clauses. *See Chiles v. Salazar*, 116 F.4th 1178, 1191 (10th Cir. 2024); *Tingley v. Ferguson,* 47 F.4th 1055 (9th Cir. 2022), *cert. denied,* 144 S. Ct. 33 (2023). The Tenth Circuit's recent decision upholding Colorado's statute protecting minors from the harm of conversion therapy is now before the Supreme Court, which is expected to hear the case in its next Term. Should this Court elect to rule on the parties' motions at this stage rather than

---

[1] All parties have consented to the filing of this brief. Counsel for the parties have not authored this brief in whole or in part. The parties and counsel for the parties have not contributed money that was intended to fund preparing or submitting the brief. No person other than the *amicus curiae* contributed money that was intended to fund preparing or submitting the brief.

1

KC 24274970.5

awaiting the Supreme Court's guidance, it should join the overwhelming majority of courts that have rejected the same claims asserted by Plaintiffs here.

PROMO is in full agreement with the City and the County that the challenged Ordinances are constitutionally valid exercises of local governments' power and authority to protect the health and well-being of youth in their communities. It submits this brief to highlight certain additional reasons why laws preventing licensed medical and mental health professionals from engaging in conversion therapy with minors do not violate the First Amendment. First, PROMO wishes to offer accurate information to the Court concerning the robust and growing medical consensus that attempts by health professionals to change a minor's sexual orientation or gender identity are unnecessary, dangerous to their physical and mental health, and provide no therapeutic benefit.

Although Plaintiffs seek to draw a link between the Ordinances and "worry about minors seeking irreversible drugs and surgeries to alleviate gender dysphoria," *see* ECF No. 10 at 1, the Ordinances do not regulate such medical interventions. Instead, the Ordinances are narrowly focused on one specific type of mental health treatment that has been shown cause a variety of serious harms, including a dramatically increased risk of suicidality. It is only this type of treatment—therapy undertaken by a licensed professional with the predetermined aim of causing a young person to "to identify consistently with their sex" rather than be transgender or "to change or alter their perceived identity or sexual attractions" rather than be gay, lesbian, or bisexual—that is prohibited under the

2

KC 24274970.5

Ordinances. ECF No. 10 at 2. The harms associated with this type of "therapy" are both severe and well documented.

Second, PROMO submits this brief to make clear that the Ordinances fit squarely within the long tradition of government regulation of medical professionals. For well over a century, if not much longer, governments have regulated medical practice, including speech that is part of medical practice, to ensure compliance with relevant standards of care and prevent harm to patients. From the earliest days of this nation, such regulations have included public health ordinances, tort liability for professional malpractice, and, later, licensing requirements and professional conduct regulations. These longstanding rules have never been thought to violate the Constitution's free speech guarantee, even when liability is based on verbal communications that violate the applicable standard of care for health professionals. This long tradition is a further reason why courts should be hesitant to adopt the rule advocated by Plaintiffs here, which would subject any regulation to strict scrutiny if it in any way affects what professionals may say in a treatment setting. Such a rule would put a broad range of long-standing professional regulations at risk of invalidation.

In keeping with this tradition, laws prohibiting therapists from performing conversion therapy with minors regulate only professional conduct; they do not apply to mere conversations, nor do they prevent therapists from expressing opinions or providing information to clients or anyone else, and they do not violate therapists' religious freedom.

KC 24274970.5

Like the many other similar laws that have been upheld against the same claims asserted here, the Ordinances regulate a specific medical treatment that is unnecessary, ineffective, and puts youth at risk of suicide and other severe harms. As such, it readily satisfies the applicable rational basis scrutiny, and—given the gravity of the harms at issue—would satisfy any level of review. For all of these reasons, Plaintiffs' motion for preliminary injunction should be denied and Defendants' motion to dismiss should be granted.

### INTEREST OF *AMICUS CURIAE*

Founded in 1986, PROMO confronts systematic inequities to liberate the full spectrum of the LGBTQ+ community from discrimination and oppression. Since its inception, PROMO has mobilized tens of thousands of Missourians—LGBTQ+ supporters, business and community leaders, legislators, and people from all backgrounds—to advocate in the halls of the Missouri State Capitol and within their own communities. PROMO's activities include advocating for LGBTQ+ youth in Missouri to defend the right to a safe and healthy environment at home and school and access to the same opportunities for enrichment and growth as every other child. PROMO is working to pass the Youth Mental Health Preservation Act, which would protect youth in the entire state from the dangerous and harmful practice of conversion therapy. PROMO was a key supporter of passage of the challenged Ordinances. PROMO serves the very population— LGBTQ+ youth—who are at risk of being subjected to the practices regulated by the Ordinances, as well as adults who have been subjected to these practices in the past and

4

may continue to experience the many well-documented and lasting harms of conversion therapy.

## BACKGROUND

For decades, "psychiatrists and others [have] recognized that sexual orientation is both a normal expression of human sexuality and immutable." *Obergefell v. Hodges*, 576 U.S. 644, 661 (2015). Similarly, being transgender is "not a mental disorder" and that "diversity in gender identity and expression is part of the human experience." Am. Psychological Ass'n, *Resolution on Gender Identity Change Efforts* (2021), *available at* https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf ("APA GICE Resolution").

In addition to being unnecessary because it does not address any underlying illness or disease, conversion therapy—also known as sexual orientation or gender identity change efforts ("SOGI change efforts")—is ineffective. As an expert panel convened by the Department of Health and Human Services recently concluded, no available research indicates that SOGI change efforts are effective in altering sexual orientation or gender identity. *See* U.S. Dep't of Health and Human Servs., Substance Abuse and Mental Health Servs. Admin., *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth* 9 (2023).[2]

---

[2] This report, from the Department of Health and Human Services' Substance Abuse and Mental Health Services Administration, was formerly available to the public on the Department's website but has been removed in recent weeks. It remains available at

KC 24274970.5

Conversion therapy that attempts to change a person's sexual orientation or gender identity offers no benefit to a minor patient, but it often leads to serious, even life-threatening, harm. As the HHS panel found, "studies on thousands of individuals who have undergone SOGI change efforts" establish that "SOGI change efforts can cause significant harm" and "are inappropriate, ineffective, and harmful practices that should not be provided to children and adolescents." *Id.*

In 2021, the American Psychological Association ("APA") found that "sexual minority youth and adults who have undergone [conversion therapy] are significantly more likely to experience suicidality and depression than those who have not …; and this elevated risk of suicidality, including multiple suicide attempts, persists when adjusting for other risk factors." Am. Psychological Ass'n, *APA Resolution on Sexual Orientation Change Efforts* 5 (Feb. 2021), *available at* https://www.apa.org/about/policy/resolution-sexual-orientation-change-efforts.pdf ("APA SOCE Resolution"). According to one study cited by the APA, "SOCE 'was the strongest predictor of multiple suicide attempts, even after adjustment for other known risk factors.'" *Id.* (citation omitted).

With respect to gender identity, the APA found that "individuals who have experienced pressure or coercion to conform to their sex assigned at birth or therapy that was biased toward conformity to one's assigned sex at birth have reported harm resulting from these experience[s] such as emotional distress, loss of relationships, and low self-

---

https://dn721907.ca.archive.org/0/items/httpsstore.samhsa.govsitesdefaultfilespep22-03-12-001/https%3Astore.samhsa.gov%3Asites%3Adefault%3Afiles%3Apep22-03-12-001.pdf

worth." APA GICE Resolution (citing studies). Efforts to change an individual's gender identity or to prevent them from being transgender "are associated with harmful social and emotional effects for many individuals, including but not limited to, the onset or increase of depression, anxiety, suicidality, loss of sexual feeling, impotence, deteriorated family relationships, a range of post-traumatic responses, and substance abuse." *Id.* at 4.

One peer-reviewed study found that more than **sixty percent** of young adults who had been subjected to conversion therapy as minors reported attempting suicide. *See* Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts with LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 67 J. Homosexuality 159, at p.10 (2020), *available* at https://www.utah.gov/pmn/files/513643.pdf. The City and County have acted to protect youth from these severe and avoidable harms.

## I.     ARGUMENT[3]

### A.    THERAPY THAT ATTEMPTS TO CHANGE SEXUAL ORIENTATION OR GENDER IDENTITY PUTS MINORS AT RISK OF SERIOUS HARM

The serious harms associated with conversion therapy are well documented. In 2021, the APA approved a pair of resolutions summarizing the current state of research on SOCE and GICE and expressing the APA's conclusion that these forms of treatment are

---

[3] PROMO agrees with the City and County that Plaintiffs also are unlikely to succeed on their other claims, including their challenges to the Public Accommodations provisions and their claims that the Ordinances are void for vagueness and violates their religious freedom under the First Amendment. *See, e.g., See Chiles*, 116 F.4th 1221-25; *Tingley*, 47 F.4th at 1084-89; *Welch v. Brown*, 834 F.3d 1041, 1047 (9th Cir. 2016); *King v. Governor of New Jersey*, 767 F.3d 216, 241-43 (3d Cir. 2014); *Doyle v. Hogan*, 411 F. Supp. 3d 337, 348–49 (D. Md. 2019), *vacated on other grounds*, 1 F.4th 249 (4th Cir. 2021).

KC 24274970.5

harmful and should not be administered to minors under any circumstances. With respect to **sexual orientation**, the APA found that "after reviewing scientific evidence on SOCE published since 2009, the APA affirms SOCE puts individuals at significant risk of harm [and] . . . opposes SOCE because of their association with harm." APA SOCE Resolution at 8. With respect to **gender identity**, the APA found that "consistent with the APA definition of evidence-based practice . . . , the APA affirms that scientific evidence and clinical experience indicate that GICE put individuals at significant risk of harm [and]. . . opposes GICE because such efforts put individuals at significant risk of harm." APA GICE Resolution at 3.

Other major medical and mental health organizations in the United States have reached similar conclusions, including: the American Medical Association, the American Psychiatric Association, the American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, the American College of Physicians, the National Association of Social Workers, the American Association for Marriage and Family Therapy, the American Psychoanalytic Association, the American Counseling Association, and the American School Counselor Association. (For the Court's convenience, excerpts from these organizations' policy statements opposing the use of conversion therapy are attached to this Brief as Exhibit A.)

This professional consensus rests on decades of study and research. In 2009, the APA reviewed the relevant scientific literature and concluded that "Scientific evidence

KC 24274970.5

shows that SOCE is not likely to produce its intended outcomes and can produce harm for some of its participants." *See* Am. Psychological Ass'n, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* 83 (2009), available at https://perma.cc/KX75-3KW4.

In 2015 and again in 2023, the Substance Abuse and Mental Health Services Administration of the U.S. Department of Health and Human Services conducted updated reviews of the scientific literature. The 2015 report found "none of the existing research supports the premise that mental or behavioral health interventions can alter gender identity or sexual orientation." U.S. Dep't of Health and Human Servs., Substance Abuse and Mental Health Serv. Admin.*, Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* (2015) (attached hereto as Exhibit B). It concluded: "Interventions aimed at a fixed outcome, such as gender conformity or heterosexual orientation, including those aimed at changing gender identity, gender expression, and sexual orientation are coercive, can be harmful, and should not be part of behavioral health treatment." *Id.*

Plaintiffs contend that "client participation is always voluntary" with their counseling, ECF No. 10 at 2, but the HHS reports make clear that therapy whose goal is to cause a young person to reject their sexual orientation or gender identity is inherently coercive and has no place in professional mental health treatment. An approach such as Plaintiffs', which explicitly seeks to cause the client to avoid same-sex relationships rather than be gay, lesbian, or bisexual, or to conform to their birth sex rather than be transgender, is the definition of conversion therapy.

9

KC 24274970.5

Plaintiffs assert that there is insufficient evidence that conversion therapy to change a minor's sexual orientation or gender identity causes harm, dismissing that evidence as mere "assertions" from "medical advocacy groups." *See* ECF No. 10 at 19. That is incorrect. A large and growing body of research, much of it detailed in the APA's 2021 resolutions, demonstrates the serious harms of therapy that seeks to change sexual orientation or gender identity. To cite one example, a 2019 study documented a dramatically increased risk of suicidality among transgender youth exposed to conversion therapy. Based on a cross-section of 27,715 transgender adults, the study found that "recalled exposure to gender identity conversion efforts was significantly associated with increased odds of severe psychological distress during the previous month and lifetime suicide attempts compared with transgender adults who had discussed gender identity with a professional but who were not exposed to conversion efforts." Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, JAMA Psychiatry (Sept. 11, 2019), available at https://doi.org/10.1001/jamapsychiatry.2019.2285. Transgender adults reporting gender identity conversion efforts before the age of ten were four times more likely to experience suicide attempts than other transgender individuals. *See id.* Other research similarly documents the inefficacy and harm of conversion therapy aimed at changing gender identity. *See* APA GICE Resolution at 1 (citing studies). Most recently, researchers found

KC 24274970.5

that recalled exposure to conversion therapy to change both sexual orientation and gender identity were associated with a range of mental health issues, including suicidality, with sexual orientation conversion therapy more closely associated with PTSD symptoms and gender identity conversion therapy more closely associated with depressive symptoms. Nguyen K. Tran et al*., Conversion practice recall and mental health symptoms in sexual and gender minority adults in the USA: a cross-sectional study*, 11 Lancet Psychiatry 879–89 (2024), available at https://doi.org/10.1016/S2215-0366(24)00251-7.

The American Psychological Association's 2021 resolutions make clear that therapeutic attempts to change sexual orientation or gender identity are both unethical and harmful, and they cite extensive evidence demonstrating the harm caused by those practices. As the APA found, "diversity in sexual orientation represents normal human variation," and "there is no scientific basis for regarding any sexual orientation negatively or as a deficit or deviance or result of trauma or parenting." APA SOCE Resolution at 4. "[R]esearch studies using a wide range of designs have found harms associated with SOCE." *Id.* at 5. Similarly, "the incongruence between sex and gender in and of itself is not a mental disorder . . . thus, any behavioral health or GICE effort that attempt to change an individual's gender identity or expression is inappropriate." APA GICE Resolution at 1. Further, "GICE are not supported by empirical evidence as effective practices for changing gender identity and are associated with psychological and social harm." *Id.* (citing studies).

KC 24274970.5

**B.** __*NIFLA* CONFIRMS THAT GOVERNMENTS MAY REGULATE MEDICAL TREATMENT TO PROTECT PUBLIC HEALTH AND SAFETY__

In *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 769 (2018) ("*NIFLA*"), the Supreme Court expressly reaffirmed the settled proposition that governments may protect patients by regulating medical treatments provided by licensed health care practitioners: "[t]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech . . . and professionals are no exception to this rule." *Id*. at 769 (internal citations omitted).

The Court rejected the argument—relied on by Plaintiffs here—that whether a law regulates conduct turns on whether the law impacts any speech at all. Rather, the Supreme Court affirmed that "States may regulate professional conduct, even though that conduct incidentally involves speech," *id*. at 768, and held that states may regulate medical practice to protect patients from harm, even when doing so restricts some speech that is "part of the practice of medicine," *id*. at 770 (emphasis omitted).

*NIFLA* explained that heightened scrutiny was required under the facts in that case because the challenged law required clinics to make disclosures that were "not tied to a [medical] procedure" and instead "applie[d] to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed." *Id.* The law therefore directly regulated "speech as speech" and improperly "compel[led] individuals to speak a particular message." *Id*. at 766, 770. The Court contrasted these untethered speech requirements with the informed consent requirement

12

previously upheld in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), which "regulated speech only as part of the *practice* of medicine." *NIFLA*, 585 U.S. at 769–70 (emphasis in original and internal quotations omitted).

Here, like the regulation upheld in *Casey*, the Ordinances are limited to the performance of a specific mental health treatment—the practice by licensed therapists of conversion therapy for minors. The law is narrow, applying only to the actual administration of that dangerous and discredited treatment. It exempts all speech between therapists and their clients that is not part of the provision of that specific treatment, including the expression of opinions and recommendations concerning sexual orientation, gender identity, conversion therapy, or any other subject. As the Ninth Circuit observed in upholding conversion therapy statutes from Washington and California that are nearly identical to the Ordinance, these laws affect speech only to the extent it is part of the professional act of administering mental health treatment and do not impact therapists' ability to speak or express opinions on any subject. *See Tingley*, 47 F.4th at 1073 (9th Cir. 2022) (citing *Pickup v. Brown,* 740 F.3d 1208, 1229 (9th Cir 2014)); *see also Chiles*, 116 F.4th at 1209. Although the Eighth Circuit has cautioned that "[s]peech is not conduct just because the government says it is," *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019), that observation does not alter the clear holdings in *NIFLA* and *Casey* that speech which is part of the provision of a particular medical treatment is subject to reasonable regulation to ensure compliance with professional standards and prevent harm

13

KC 24274970.5

to patients. Conversion therapy laws are not subject to any form of heightened scrutiny under the First Amendment because the conduct regulated by these laws is not merely "tied to a [medical] procedure," *NIFLA,* 585 U.S. at 770, but consists solely of the *administration of the procedure itself.*

**C.  THE ORDINANCES ARE A CONSTITUTIONALLY PERMISSIBLE REGULATION OF LICENSED HEALTH PROFESSIONALS' ADMINISTRATION OF A PARTICULAR MEDICAL TREATMENT**

As many courts have concluded in upholding laws similar to the Ordinances, the purpose of legislation protecting minors from the practice of conversion therapy is to protect the health and well-being of minors based on the broad medical consensus that conversion therapy is unnecessary, ineffective, harmful, and unethical. These laws seek to prevent minor patients from being subjected to an unsafe treatment that puts minors at risk of life-threatening harm while providing no therapeutic benefit, not to restrict therapists' speech or compel communication of the government's preferred message. *See Chiles*, 116 F.4th at 1208 ("It is the practice of conversion therapy—not the discussion of the subject by the mental health provider—that is a '[p]rohibited activit[y]' . . .") (citation omitted); *Pickup*, 740 F.3d at 1231 ("Because SB 1172 regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against, [conversion therapy], we conclude that any effect it may have on free speech interests is merely incidental"); *Tingley,* 47 F.4th at 1078–79 (same); *King v. Governor of New Jersey*, 767 F.3d 216, 237 (3d Cir. 2014) ("The New Jersey legislature has targeted [conversion therapy] counseling for prohibition because it was presented with evidence that this

KC 24274970.5

particular form of counseling is ineffective and potentially harmful to clients.").[4] Like these appellate courts, federal district courts, both before and after *NIFLA,* have repeatedly upheld conversion therapy laws against claims that they infringe on therapists' freedom of speech. *See, e.g., Catholic Charities of Jackson v. Whitmer*, No. 1:24-CV-718, 2025 WL 369743, at *15 (W.D. Mich. Jan. 28, 2025); *Doyle,* 411 F. Supp. 3d at 348.

Like the many other conversion therapy laws that courts across the country have upheld against First Amendment claims, the Ordinances do not compel any speech. They do not prevent therapists from expressing their ideas or opinions on sexual orientation, gender identity, or any other topic, whether in the public sphere or privately to their clients. The Ordinances do only one thing: they prevent licensed therapists from subjecting minor patients to a specific course of medical treatment that has been overwhelmingly rejected by the medical community as ineffective and unsafe for minors. The City and County have acted properly to prevent licensed professionals from subjecting patients to potentially life-threatening harm. The only thing proscribed is a particular mental health treatment—not expressive speech.

For this reason, the Ordinances are properly understood as conduct regulations with at most an incidental impact on speech. Like the challenged regulation in *Casey*, which

---

[4] The Eleventh Circuit reached a different result with respect to two local Florida ordinances on conversion therapy. *See Otto v. City of Boca Raton,* 981 F.3d 854 (11th Cir. 2020). But as the Ninth Circuit observed, even though the Eleventh Circuit disagreed with its sister circuits that the ordinances regulated conduct rather than speech, the Eleventh Circuit nevertheless recognized the fundamental principle that "'States may regulate professional conduct.'" *Id.* at 865. *See also Tingley*, 47 F.4th at 1077.

"regulated speech only as part of the *practice* of medicine," *NIFLA*, 585 U.S. at 770 (internal quotations omitted), the Ordinances prohibit only the *practice* of conversion therapy. To the extent speech is implicated at all, it is only because in mental health therapy, speech ordinarily is the *manner* of delivering treatment. But government "do[es] not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through scalpel." *Tingley*, 47 F.4th at 1064. "Talk therapy is a treatment, not an informal conversation among friends" and "can carry long-lasting, life-altering consequences for patients." *Chiles,* 116 F.4th at 1208, 1211. To hold that talk therapy is communicative speech akin to ordinary conversation rather than professional mental health treatment would be "to conclude—erroneously—that mental health care is not really health care and that talk therapy is not really medical treatment." *Id.* at 1210–11.

Like other conversion therapy laws that have been upheld against First Amendment challenges, the Ordinances exempt all speech between therapists and their clients that is not part of treatment. The Ordinances do not prohibit mental health professionals from publicly or privately stating a belief in the efficacy or propriety of conversion therapy for minors or adults, or from publicly or privately stating religious or other beliefs about LGBTQ+ people. They do not require mental health professionals to make any affirmative statements at all, whether about conversion therapy or any other subject, and they do not apply to the conduct of individuals not operating under a state license. For this reason, the

16

Ordinances are permissible regulations of professional conduct, even if they have an incidental impact on speech that is a necessary part of performing the relevant treatment.[5]

### D. GOVERNMENTS HAVE LONG REGULATED HEALTH PROFESSIONALS' COMPLIANCE WITH STANDARDS OF CARE, INCLUDING WHEN SUCH STANDARDS ARE VIOLATED BY TREATMENT DELIVERED THROUGH VERBAL COMMUNICATION

The majority opinion in *NIFLA* went out of its way to head off any implication that its holding was intended to unsettle laws that fall within "the traditional purview of state regulation of professional conduct," including informed consent requirements and "[l]ongstanding torts for professional malpractice." *NIFLA*, 585 U.S. at 769. *NIFLA* stressed that such "longstanding" regulations remain good law and require no special First Amendment scrutiny. In *Tingley*, the Ninth Circuit followed this reasoning from *NIFLA* and held that a law protecting youth from the harms caused by conversion therapy "regulates a category of speech belonging to such a tradition, and it satisfies the lesser scrutiny imposed on such laws." *Tingley*, 47 F.4th at 1079. *See also Chiles,* 116 F.4th at 1206 ("There is a long-established history of states regulating the healthcare professions.").

The fact that government has long regulated health care professionals to ensure that their practice, including speech that is part of that practice, complies with relevant standards of care reinforces the need for caution before applying the First Amendment in

---

[5] Plaintiffs assert that the Ordinances are viewpoint as well as a content-based speech restrictions, ECF No. 10 at 7, but they do not prevent the expression of any opinions or viewpoints. "[B]ecause it [is] a regulation of conduct," a law preventing licensed therapists from performing conversion therapy on minors "[does] not require content and viewpoint analysis." *Tingley*, 47 F.4th at 1073 (citing *Pickup*, 740 F.3d at 1231).

KC 24274970.5

an unprecedented way. Courts should not adopt a new First Amendment standard that would require ordinary medical practice regulations such as the Ordinances to satisfy strict scrutiny merely because the treatment at issue is usually conducted verbally, through talk therapy.

Regulation of medical professionals' compliance with standards of care dates to the founding of the nation, if not much earlier. What is known today as malpractice has long been recognized as a tort at common law. In the eighteenth century, William Blackstone stated that "mala praxis is a great misdemeanor and offense at common law . . . because it breaks the trust which the party had placed in his physician, and tends to the patient's destruction." 3 William Blackstone, Commentaries on the Laws of England, Ch. 8, p. 122 (1772). The American colonies also recognized common law liability for harm arising from a physician's failure to exercise due care. *See* George J. Annas, *Doctors, Patients, and Lawyers — Two Centuries of Health Law*, 367 New Eng. J. Med. 445 (2012).

Traditional malpractice liability extended not only to cases in which a physician failed to exercise adequate care in performing surgery or administering medications, but also when their *speech* failed to comply with applicable standards of care and resulted in harm. *See, e.g., Fowler v. Sergeant,* 1 Grant 355, 356 (Pa. 1856) (holding physician liable for malpractice where his instructions to patient's wife concerning care for an injury fell below standard of care and resulted in pain and suffering); *Graham v. Gautier,* 21 Tex. 111, 118-19 (1858) (holding physician liable for failing to give proper instructions on

18

treatment of illness); *Ballou v. Prescott,* 64 Me. 305, 310 (1874) (holding that physician would be responsible if patient "was misled by any directions, or any want of directions, which it was [the doctor's] duty to give"). Mental health professionals have likewise been subject to tort liability when their verbal acts or omissions violate their duty of care.

The administration of health care has long been regulated by statute as well as the common law. Public health ordinances "were passed in various colonies very early in the colonial period." Nissa M. Strottman, *Public Health and Private Medicine: Regulation in Colonial and Early National America*, 50 Hastings L.J. 383, 387 (1999). Indeed, cities initially led the way in creating boards of public health to oversee these matters. *Id*. at 389. In a parallel development, state legislatures in the 1800s began requiring licensing and oversight of medical practitioners. *Id*. at 393–94; *see also Dent v. West Virginia*, 129 U.S. 114, 122–23 (1889) (upholding state licensure requirements for doctors).

After the Civil War, government authority to regulate medical practice was "too well settled to require discussion." *Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine."); *see also, Collins v. State of Tex.*, 223 U.S. 288, 296–97, 32 S. Ct. 286, 288, 56 L. Ed. 439 (1912) (upholding licensing requirements for osteopaths who required scientific training to diagnose patients); *Crane v. Johnson*, 242 U.S. 339, 340 (1917) (upholding licensing requirements for "drugless practitioner" who "does not employ either medicine, drugs, or surgery in his practice").

KC 24274970.5

As the mental health professions emerged as a distinct field of medical care, regulation of those occupations followed. In 1917, for example, the Supreme Court upheld California's licensing requirement for "drugless [healthcare] practitioner[s] [who] employ in practice faith, hope, and processes of mental suggestion and mental adaptation" as falling within "the general scope of the police power of the state." *Crane,* 242 U.S. at 340, 344. The fact that the practice of these health occupations involved speech rather than techniques such as the administration of drugs did not lessen the authority of states to regulate them to protect the health and safety of individuals under their care.

The Ordinances were enacted as part of this long tradition of regulation of the health professions and reflects the recognition that "[t]he difference between skilled and inept talk therapy—no less than that between deft and botched surgery—can, in some cases, mean the difference between life and death." *Otto v. City of Boca Raton,* 41 F.4th 1271, 1292 (11th Cir. 2022) (Rosenbaum, J., dissenting from denial of rehearing en banc). "The practice of psychotherapy is not different from the practice of other forms of medicine simply because it uses words to treat ailments." *Tingley,* 47 F.4th at 1082.

The constitutionality of the Ordinances must be assessed against this long historical background of regulation of health care professionals. The fact that mental health professionals provide care through talk therapy instead of, or in conjunction with, prescription medications or other physical interventions, does not lessen the importance of this historical tradition. The comprehensive system of regulation that governs the practice

20

KC 24274970.5

of medical and health care professionals has long held the health and safety of patients to be of paramount importance. Moreover, the fact that some professionals, such as Plaintiffs, may disagree with existing professional standards of care does not diminish governmental authority to ensure that providers operating under a state license comply with those standards to protect patients. This historical tradition provides an additional reason for this Court to conclude that the Ordinances do not require application of strict scrutiny under the First Amendment.

## CONCLUSION

For the foregoing reasons, PROMO respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction.

Dated this 16th day of April 2025.

Respectfully submitted,

SPENCER FANE LLP

By: */s/ Leslie Greathouse*
Leslie A. Greathouse (MO #48431)
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216 (facsimile)
lgreathouse@spencerfane.com

and

21

KC 24274970.5

Christopher F. Stoll (CA # 179046)*
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Telephone: 415-392-6257
Fax: 415-392-8442

*Motion for pro hac vice admission
forthcoming.

*Attorneys for Amicus Curiae PROMO*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of April 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, using the Court's electronic filing system, which will send notification of the following to all counsel of record.

*/s/ Leslie Greathouse*
Attorney for *Amicus Curiae* PROMO

KC 24274970.5