## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| WYATT BURY, LLC,  BALLPARK INVESTMENTS LLC, D/B/A HOPE AND HEALING COUNSELING; WYATT BURY, PAMELA EISENREICH,  STATE OF MISSOURI EX REL. MISSOURI ATTORNEY GENERAL ANDREW BAILEY,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF KANSAS CITY, MISSOURI, JACKSON COUNTY, MISSOURI,<br><br>Defendants. | )<br>)<br>)<br>)<br>)   Case No. 4:25-cv-00084-RK<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Plaintiffs—two Missouri-licensed professional counselors and their counseling practices (collectively, "Counselor Plaintiffs") and the Missouri Attorney General on behalf of the State of Missouri ("State of Missouri")—challenge the constitutionality of two local ordinances (one city and one county) prohibiting conversion therapy[1] as provided to minor counseling clients. Plaintiffs also challenge the constitutionality of a public accommodations anti-discrimination city ordinance. Plaintiffs argue that the challenged ordinances—facially and as applied—are unconstitutional under the First Amendment Free Speech and Free Exercise Clauses, and the Fourteenth Amendment Due Process Clause. Now before the Court are (1) Plaintiffs' motion for preliminary injunction (Doc. 9), (2) Defendants' motion to stay (Doc. 17), and (3) Defendants' motion to dismiss (Doc. 19). The motions are fully briefed. (Docs. 10, 20, 27, 31, 34, 37, 42.)[2] The Court held a preliminary injunction hearing for oral argument on May 14, 2025.

---

[1] The challenged ordinances and the parties use the term "conversion therapy." Other terms that are sometimes used include "sexual orientation and gender identity change efforts" or "sexual orientation change efforts." The Court will use the term "conversion therapy" in this Order because that is the term used (and defined) in the relevant ordinances that are being challenged here.

[2] In addition, a local LGBTQ+ public policy and advocacy organization—PROMO—filed an *amicus curiae* brief in support of the City of Kansas City with leave of Court as unopposed by the parties. (Doc. 33).

## I.     Counselor Plaintiffs' Counseling Practices

Plaintiffs Wyatt Bury and Pamela Eisenreich are both licensed professional counselors. (Doc. 9-1 at ¶ 5; Doc. 9-2 at ¶ 4.)  They provide professional counseling services within Kansas City, Missouri, and Jackson County, Missouri.  (Doc. 9-1 at ¶¶ 3, 6; Doc. 9-2 at ¶¶ 2, 5.)  Bury and Eisenreich are Christians.  Their Christian faith and beliefs inform and guide their professional counseling practices, including when providing counseling to clients on issues touching on a client's sexual orientation and gender identity.  (Doc. 9-1 at ¶ 38; Doc. 9-2 at ¶¶ 33, 35.)  They do not provide counseling in a manner which would contradict their religious faith and beliefs.  While they provide counseling services to both Christians and non-Christians alike and do not impose their own Christian faith on their clients, if a client wishes to expressly integrate a shared Christian faith into their counseling, both counselors will do so.  (Doc. 1 at ¶¶ 49, 52, 53; Doc. 9-1 at ¶¶ 20, 24, 25, 26; Doc. 9-2 at ¶¶ 16, 20.)

Bury and Eisenreich see both minors and adults who struggle with anxiety, depression, trauma, and relational issues, as well as couples for pre-marital, marital, and couples counseling. (Doc. 9-1 at ¶¶ 41; Doc. 9-2 at ¶¶ 14, 15 30.)  All counseling they do, especially when they are counseling a minor client, is only pursued so long as the (minor) client is willing and voluntarily participates in counseling.  (Doc. 1 at ¶ 74.)  When Bury and Eisenreich engage in counseling with a client, their primary focus is to personally connect with the client and to build a relationship of trust.  In doing so, the purpose of their counseling is that the client is able to move through a process of self-discovery as guided by Bury and Eisenreich's probing questions, advice, and suggestions during the counseling to work towards the client's personal goals and objectives. (Doc. 9-1 at ¶¶ 31, 33, 35, 37, 39; Doc. 9-2 at ¶¶ 22, 26, 27, 28.)

## II.     The Challenged Local Ordinances

### A.     City's Counseling Ordinance (Prohibiting Conversion Therapy for Minors)

On November 14, 2019, the City Council of Kansas City, Missouri, passed Ordinance No. 190902, enacting Section 50-234 in Article VII of Chapter 50 of the Kansas City Code of Ordinances.  In enacting the ordinance, the City Council found that conversion therapy—as a

---

[3] The facts here are taken primarily from Plaintiffs' verified complaint and accompanying exhibits, as well as the parties' declarations and exhibits submitted and attached to the preliminary injunction and motion to dismiss briefing.  For purposes of Defendants' motion to dismiss, the Court presumes the facts in the verified complaint are true.

"range of . . . practices aimed at changing one's sexual orientation or gender identity"—is a discredited therapy without scientifically valid evidence to support it, and which has been found by the "national community of professionals in education, social work, health, mental health and counseling" to be both ineffective and "substantially dangerous to an individual's mental and physical well-being," including to the extent it "has been shown to contribute to depression, self-harm, low self-esteem, family rejection, and suicide." (Doc. 1-1 at 2.) The City Council accordingly resolved that "all minors in Kansas City . . . that seek therapy or treatment to assist them in understanding their individual development of gender identity or their sexual orientation should be free from exposure to the serious harms and risks caused by conversion therapy . . . ." (*Id.*)

Section 50-234 of the Kansas City Code of Ordinances provides in full:

Sec. 50-234 Conversion Therapy of minors prohibited.

*(a) Policy.* The City of Kansas City, Missouri, has a compelling interest in protecting the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers. These provisions are exercises of the police power of the city for the public safety, health, and welfare; and its provisions shall be liberally construed to accomplish that purpose.

*(b) Definitions.* As used in this section, the following terms shall have the meaning indicated in this subsection:

    (1)    *Conversion therapy or reparative therapy* means any practice or treatment that seeks to change an individual's sexual orientation or gender identity, including efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender. Conversion therapy shall not include counseling that provides support and assistance to a person undergoing gender transition, or counseling that provides acceptance, support and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral treatment interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity.

    (2)    *Gender identity* means the gender-related identity, appearance, expression, behavior or mannerisms or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth.

    (3)    *Minor* means a person less than 18 years old.

3

(4)     *Provider* means any licensed medical or mental health professional including, but not limited to, licensed professional counselors, licensed psychologists, licensed clinical social workers, provisional licensed counselors, provisional and temporary licensed psychologists, licensed and provisional licensed marital and family therapists, psychiatrists, certified substance abuse counselors, certified school counselors, behavior analysts and any professional listed under Chapters 334 and 337 of the Revised Statutes of Missouri.

(5)     *Sexual orientation* means the preference or practice of homosexuality, heterosexuality, asexuality, and bisexuality, or some combination thereof, by consenting adults, or as perceived by others, but not including sexual preference or practice between an adult and a minor.

(c) *Prohibited practice*. It shall be unlawful for any provider to provide conversion therapy or reparative therapy to a minor if the provider receives compensation in exchange for such services.

(d) *Penalty*. Any person that violates any provision of this section shall be subject to the civil penalty prescribed in section 1-17 [i.e., either a fine of not less than $1.00 or not less than $300.00 under some circumstances, and not more than $500.00] but in no instance shall a violation of this article be punishable by imprisonment.

Section 2. That it is the City Council's intent that this ordinance regulate professional conduct and the manner in which therapeutic treatment is delivered, but does not otherwise prohibit or limit proponents or opponents of conversion therapy to speak about gender or sexual orientation conversion publicly and privately, including to their minors in forms other than therapy.

**B.      County's Counseling Ordinance (Prohibiting Conversion Therapy for Minors)**

On April 3, 2023, the County Legislature of Jackson County, Missouri, passed Ordinance No. 5731, enacting sections 667 and 5575 of the Jackson County Code. Jackson County's Counseling Ordinance is substantially the same as Kansas City's Counseling Ordinance. Under the Jackson County Counseling Ordinance, a violation is subject to a potential fine of not more than $1000 upon conviction. Jackson Cnty. Ord. § 5575.3.

**C.      City's Public Accommodations Anti-Discrimination Ordinance (Prohibiting Sexual Orientation and Gender Identity Discrimination)**

Finally, as amended by the City Council of Kansas City in 2013 by Ordinance No. 130041, Section 38-113(a) of the Kansas City Code prohibits, in places of public accommodation, (1) discrimination in the provision of accommodations or facilities based on a person's "sexual orientation or gender identity," and (2) the publication, circulation, or display of

4

any written or printed communication, notice or advertisement to the effect that any of the accommodations or the facilities of such place of public accommodation will be refused, withheld from or denied to any person on account of . . . sexual orientation or gender identity, or that, for such reasons, the patronage or custom of any person described in this section is unwelcome or objectionable or not acceptable to such place.

## III. The Alleged Impact of the Challenged Ordinances on Counselor Plaintiffs' Counseling Practices

Counselor Plaintiffs contend that the challenged ordinances impact the counseling that they provide because they are unable, without fear of violating the challenged ordinances:  (1) "to offer only counseling about marriage, sexuality, and gender identity consistent with their faith," such as by counseling clients to identify with their sex and to pursue sexual activities and desires only in the context of marriage between a man and a woman, and to refer to clients only with pronouns consistent with their sex, (2) publish their beliefs on their counseling practice websites and other written materials, and (3) question prospective clients to learn whether the requested counseling would violate Counselor Plaintiffs' religious beliefs.  (Doc. 10 at 10.)  Bury and Eisenreich attest that to comply with the challenged ordinances in light of their religious beliefs, they have had to refer potential clients to other counselors[4] and have been unable to expand their counseling practice to help minors specifically address issues involving their gender identity and sexual orientation. (Doc. 9-1 at ¶¶ 42, 43, 46, 49; Doc. 9-2 at ¶¶ 39, 43, 44, 46, 51.)  Plaintiffs accordingly seek declaratory and injunctive relief in this lawsuit to the extent these ordinances violate the First Amendment Free Speech and Free Exercises Clauses, and the Fourteenth Amendment Due Process Clause.

## Discussion

## I. Defendants' Motion to Stay

First, the Court addresses Defendants' motion to stay.  (Doc. 17.)  Defendants seek a stay of this action (other than "minimal discovery into only the issue of standing," *see* § II.A.2, below) pending a final decision by the United States Supreme Court in *Chiles v. Salazar* anticipated by the end of the next Supreme Court term.  In *Chiles*, the Tenth Circuit held that a Colorado law "prohibit[ing] mental health professionals from providing 'conversion therapy' [that is, therapy to

---

[4] It is not entirely clear whether the other counselors to whom Counselor Plaintiffs have referred clients or potential clients would be counselors who practice outside the jurisdiction of the City and County, but the Court presumes this would be true.

change a client's sexual orientation or gender identity] to minor clients" is not unconstitutional under the First Amendment's Free Speech Clause. *See generally Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2024). The Supreme Court granted certiorari in *Chiles* to consider whether Colorado's conversion therapy ordinance is constitutional under the First Amendment. *See* Question Presented, *Chiles v. Salazar*, No. 24-539 (U.S.), https://www.supremecourt.gov/qp/24-00539qp.pdf (stating the Question Presented in *Chiles v. Salazar* as: "Whether a law that censors certain conversations between counselors and their clients based on viewpoints expressed regulates conduct or violates the Free Speech Clause"). Accordingly, Defendants argue in the motion to stay that the Supreme Court's resolution of *Chiles* "will likely grant substantial guidance to this Court in deciding the issues before it" and therefore proceeding in this litigation "risks duplication of litigation efforts, the waste of . . . resources, and incongruent results." (Doc. 17 at 2, ¶ 6.) Plaintiffs oppose Defendants' motion to stay. (Doc. 27.)

To start, the Court finds that Defendants' motion to stay fails to comply with Local Rule 7.0(a). Local Rule 7.0(a) requires that written motions "must be supported . . . with suggestions, which are a written brief containing relevant facts and applicable law." Defendants' motion to stay is not accompanied by any supporting brief and does not point to or cite any relevant caselaw, including any discussion whatsoever of the relevant legal framework or authority supporting Defendants' requested stay. The motion to stay would justifiably be denied on this ground alone. Nonetheless, the Court will consider the merits of Defendants' motion to stay.

District courts generally enjoy "broad discretion" in determining whether to stay an action on its docket. *Sierra Club v. U.S. Army Corps of Eng'rs*, 446 F.3d 808, 816 (8th Cir. 2006). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (citing *Clinton v. Jones*, 520 U.S. 681, 708 (1997); *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)). In considering a stay in these circumstances, the Court "weighs the potential prejudice or hardship to the parties, as well as the interest of judicial economy." *Perrin v. Papa John's Int'l, Inc.*, No. 4:09-CV-01335-AGF, 2015 WL 3823142, at *4 (E.D. Mo. June 19, 2015). The Court "must exercise its judgment to weigh competing interests and maintain an even balance." *Hon v. Centene Mgmt. Co., LLC*, No. 4:22-CV-1091 RLW, 2023 WL 2239041, at *1 (E.D. Mo. Feb. 27, 2023) (internal quotation marks omitted). The Court considers the following factors: "whether the non-moving party faces any potential prejudice, the hardship and inequity to the moving party if the action is not stayed, and

6

whether a stay might preserve judicial resources." *Thompson v. Rally House of Kansas City, Inc.*, No. 15-008886-CV-W-GAF, 2016 WL 9023433, at *4 (W.D. Mo. Jan. 25, 2016).

Upon weighing the competing interests present in this case, the Court declines to stay this action pending a decision by the Supreme Court anticipated sometime next term in *Chiles v. Salazar*. As Plaintiffs point out (and as Defendants appear to acknowledge to some degree) while resolution of the merits in *Chiles* should provide some guidance as to the free-speech claim, it will not have a bearing on Plaintiffs' claims under the Due Process or Free Exercise clauses. A stay of unknown duration—but potentially up to a year from now—would prejudice Plaintiffs and others similarly situated given the important public interests at stake in this litigation, with only, at most, a modest conservation of judicial resources. The Court notes as well that in conjunction with Defendants' request for a stay, Defendants have from the outset vigorously defended the constitutionality of the local ordinances and robustly challenged every Plaintiffs' standing to bring suit. (*See* Doc. 20 at 7 (arguing that "[r]egardless of what happens with the *Chiles v. Salazar* case, this case should be dismissed and the preliminary injunction denied.").) Fundamentally, the Court notes that the mere fact that a petition for certiorari has been granted does not change or alter the existing caselaw. *See Darrington v. United States*, No. 4:20-CV-00490-DGK, 2020 WL 9596329, at *2 (W.D. Mo. Aug. 20, 2020).

Other than partially conserving judicial resources to the extent *Chiles* may have bearing on some of the issues ultimately presented in this case, Defendants have not identified any persuasive hardship or inequity that would justify a stay. This deficit is significant especially when considering the interests and important constitutional questions at issue on both sides of the dispute, and given Defendants' vigorous defense of the local ordinances on the merits and jurisdictional grounds.[5] Accordingly, in the Court's discretion and upon carefully weighing the factors above in the context of this case, Defendants' motion to stay is denied.

---

[5] In their reply, Defendants' argument focuses on an asserted lack of harm (i.e., prejudice) to Plaintiffs from the stay. As best as the Court can discern, Defendants argue for the first time that any alleged First Amendment harm or prejudice to Plaintiffs does not outweigh "the benefit to protect children from enduring conversion therapy." (Doc. 37 at 4.) The bulk of Defendants' arguments that Plaintiffs would not be harmed or prejudiced by a stay appear to rely on Defendants' position that the challenged ordinances do not apply to Counselor Plaintiffs' counseling practices. Because these arguments fundamentally go to the merits of Plaintiffs' claims, however, the Court is not persuaded that these arguments otherwise justify a stay of the litigation. The Court is cognizant of the important and weighty interests for the parties and the public that are present on both sides of this dispute and only finds here that the balance does not weigh in favor of a stay of this litigation.

## II.   Article III Standing

Next, the Court considers whether Plaintiffs—Counselor Plaintiffs and the State of Missouri—have sufficient standing to bring the claims asserted here, as challenged by Defendants. *See Missouri v. Trump*, 128 F.4th 979, 989 (8th Cir. 2025) (Article III standing concerns a threshold jurisdictional issue).

### A.   Counselor Plaintiffs' Standing

"The irreducible constitutional minimum of standing requires a showing of injury in fact to the plaintiff that is fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (internal quotation marks omitted). As to Counselor Plaintiffs, Defendants focus only on one element of Article III standing: injury-in-fact. The Court finds, accordingly, that at this initial stage, the other Article III standing requirements of redressability and traceability appear to be satisfied here.

#### 1.   Injury-in-Fact

The Eighth Circuit has recognized that the injury-in-fact requirement of constitutional standing under Article III requires "an invasion of a legally cognizable right." *Id.; see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The injury-in-fact requirement that a plaintiff demonstrate an invasion of a legally cognizable right "ensure[s] that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). In analyzing a plaintiff's standing—and determining whether a plaintiff has identified an injury or harm to a legally cognizable right sufficient to satisfy Article III's injury-in-fact requirement—the Court must be mindful "not [to] conflate Article III's requirement of injury in fact with whether a plaintiff has stated a cause of action because the concepts are not coextensive." *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1077 (8th Cir. 2024) (internal quotation marks omitted).

In *Susan B. Anthony List*, the Supreme Court recognized that when a plaintiff alleges an injury (including an injury to a plaintiff's rights as secured under the U.S. Constitution) arising from the *threatened* enforcement of a law, the plaintiff need not show "an actual arrest, prosecution, or other enforcement action" to satisfy Article III's injury-in-fact requirement. 573 U.S. at 158. Instead, in *Susan B. Anthony List*, the Supreme Court recognized that "pre-enforcement review" is permitted and is consistent with constitutional standing doctrine so long as "the threatened

8

enforcement [of the law] is sufficiently imminent." *Id.* at 159. In other words, "a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (internal quotation marks omitted); *see Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 603 (8th Cir. 2022); *see also Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1391 n.5 (8th Cir. 1985) (recognizing that "relaxed standing requirements exist when First Amendment rights and values are potentially at stake").

### i. Counseling Ordinances and Public Accommodation Ordinance (as to counseling)

In the First Amendment context in particular, "[t]he chilling of [a plaintiff]'s First Amendment Rights" can be a cognizable injury-in-fact sufficient to satisfy Article III's standing requirement. *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 487 (8th Cir. 2006); *see 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (recognizing in this context that "the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute" and that "[s]elf-censorship can itself constitute injury in fact"). When a plaintiff raises a First Amendment challenge that alleges an injury in the form of self-censorship or chilled speech, the Article III standing inquiry is a "forgiving" one that is "satisfied so long as the plaintiff's intended future conduct is arguably proscribed by the [law] it wishes to challenge." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (internal quotation marks omitted); *Reynolds*, 89 F.4th at 1077 ("When the alleged injury is a chill on constitutionally protected speech, the First Amendment gives a more 'lenient standing requirement' to pre-enforcement challenges . . .") (quoting *Turtle Island Foods*, 992 F.3d at 700); *see Parents Def. Education v. Linn Mar Comm. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023) (recognizing that "[w]hen a course of action is within the plain text of a policy, a 'credible threat' of enforcement exists").

In *Zanders v. Swanson*, 573 F.3d 591 (8th Cir. 2009), for example, as cited by Defendants, the Eighth Circuit held that the plaintiffs in that case "fail[ed] to meet their Article III burden" to demonstrate standing in a pre-enforcement challenge to a state law under the First Amendment, because, "the speech [they] claim is chilled by the statute . . . is not the target of the statute's prohibition." *Id.* at 594. As relevant there, the Eighth Circuit reasoned that "the speech Plaintiffs claim is chilled by the statute—the right to make truthful (or not knowingly false) claims of police misconduct—is not the target of the statute's prohibition, which criminalizes the reporting of police

9

misconduct knowing that the information is false." *Id.* Thus, the Eighth Circuit held in *Zanders* that the plaintiffs' "sincere fear" that the statute "*could* be manipulated or that the police *might* misuse the criminal justice system for retaliatory purposes" was too speculative to demonstrate an actionable Article III injury-in-fact. *Id.* The Eighth Circuit recognized that the *Zanders* case was somewhat unusual. It noted, in particular, that in the normal case, "the behavior allegedly chilled is the target or object of the challenged statute's prohibitions and there is ordinarily little question that the [law] has caused [the alleged constitutional] injury." *Id.* (cleaned up). So it is here.

The Court is not persuaded by Defendants' attempt to draw a parallel between this case and *Zanders*. Unlike *Zanders*, the fears of the Counselor Plaintiffs are not speculative and easily fall within the scope of the challenged ordinances. Defendants primarily argue that Counselor Plaintiffs lack standing because the Counseling Ordinances do not prohibit "[c]onversations exploring sexuality and gender topics" but only prohibit "the practice of conversion therapy upon children." The Defendants' argument misses the mark as to the Counselor Plaintiffs' "sincere fear" and as to what the chilled speech includes. Counselor Plaintiffs allege in the verified complaint that the challenged ordinances impact the professional counseling services they are able to provide to minor clients, in that they have traditionally engaged in conduct that is prohibited by the challenged Counseling Ordinances. Because Counselor Plaintiffs provide counseling services that are only consistent with their Christian faith and beliefs, the Counseling Ordinances both chill their speech and cause them to self-censor conversations and topics they engage in with clients and potential clients

Plaintiff Eisenreich alleges that she only provides counseling that is consistent with her Christian beliefs. For example, if a minor is believed to be sexually or romantically attracted to the same sex, she provides counseling intended to encourage the minor to change the minor's sexual orientation or reduce same-sex attractions when requested by the minor's parents or even the minor client herself. If a minor is believed to identify as a gender different from their biological sex, Plaintiff Eisenreich provides counseling intended to encourage the minor client to change their gender identity and to live, act, and feel consistent with their biological sex. Additionally, both Counselor Plaintiffs allege that when counseling minors, they do not promote, encourage, or sanction any behavior or identity by or of the minor that would be contrary to the minor's sex. Similarly, Counselor Plaintiffs allege that they will only provide counseling that promotes sexual activity within the context of marriage as between one man and one woman, and will not provide

marriage or relational counseling that encourages the pursuit of same-sex marriage or same-sex romantic relationships.

Counselor Plaintiffs allege in the verified complaint that because of the ordinances, they must refer potential clients to other counselors when the counseling requests would violate their religious beliefs. This includes referring minor clients to other counselors when the counseling issues involve a minor's sexual orientation, same-sex sexual behaviors, or gender identity because the services Counselor Plaintiffs would traditionally provide (which are consistent with their own religious beliefs) would violate the Counseling Ordinances. In other words, Counselor Plaintiffs must now refer counseling requests involving the gender identity of a minor because their traditional counseling services would encourage the minor to live, act, and feel only as is consistent with the minor's biological sex. Also Counselor Plaintiffs must now refer counseling requests involving homosexuality and bi-sexuality of a minor because their traditional counseling services seek to change or alter the minor's same-sex sexual or romantic behaviors and desires.

In short, the Court is persuaded that Counselor Plaintiffs have adequately alleged a cognizable injury-in-fact to assert their constitutional challenges in this pre-enforcement action. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (injury-in-fact element of standing is satisfied when "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take . . . compliance measures or risk criminal prosecution").[6]

---

[6] Defendants also suggest that Counselor Plaintiffs cannot show a cognizable injury-in-fact because the verified complaint affirmatively alleges that Counselor Plaintiffs "do not engage in 'aversive techniques,' which is what the ordinances ban." (Doc. 20 at 18.) Defendants' suggestion in this regard is at best imprecise, misguided, and potentially disingenuous. Each Counseling Ordinance broadly defines "conversion therapy" as "*any* practice or treatment that seeks to change" a minor's identity, behavior, expressions, or feelings concerning their sexual orientation or gender identity. Nothing in the plain language of the challenged ordinances supports any plausible suggestion that they only prohibit conversion therapy that uses or employs aversive techniques, i.e., a term of art that implies the use of negative stimuli whether physical, visual, sensory, or emotional. To suggest that the Counseling Ordinances do not apply to Counselor Plaintiffs because they do not engage in aversive techniques is not well-founded even on a cursory review of the text of the ordinances themselves. And Defendants' tautological parsing of the Counseling Ordinances—that they prohibit the practice or treatment of conversion therapy while allowing counselors to "[h]elp clients deal with sexual attractions, behaviors and identities . . . so long as this assistance does not include efforts to change minor client's gender identity or sexual orientation," (*id.* at 18), *i.e., that the Counseling Ordinances do not prohibit therapy or counseling that is not conversion therapy*—provides no plausible support for this position, either. The Court does not consider these baseless arguments any further.

11

## ii. Public Accommodation Ordinance (as to pronouns)

The City also challenges in particular Counselor Plaintiffs' standing as to the Public Accommodation Ordinance and its regulation of pronoun usage.[7] The City claims that Counselor Plaintiffs do not need to use any pronouns with clients and can use the client's first name, for example. (Doc. 20 at 32 (citing Doc. 1 at 16, ¶ 90 (alleging that "[w]henever the Counselors receive a request that they cannot fulfill because of their religious beliefs . . . they generally try to . . . us[e] first names or working with the client on an appropriate and respectful but honest accommodation")).) The Court finds at this juncture that this argument misses the mark.

Counselor Plaintiffs allege that the Public Accommodation Ordinance "requires" that they "refer to clients and prospective clients by using those persons' self-selected pronouns," and that the City (1) "considers it to be sexual-orientation or gender-identity discrimination . . . to use pronouns only consistent with sex," and (2) "considers the Counselors' policy and practice . . . on pronouns to be [an] unlawful discriminatory practice[] based on gender identity and sexual orientation." (Doc. 1 at 40, ¶¶ 254, 256, 257.) Counselor Plaintiffs allege that they "desire to continue to follow their pattern and practice of referring to their clients with pronouns consistent with their sex . . . and to refrain from referring to clients with pronouns inconsistent with their sex." (*Id.* at 45, ¶ 283.) Plaintiff Eisnreich's declaration attached to the motion for preliminary injunction includes much the same. (Doc. 9-2 at 5, ¶¶ 33, 34; 6 at ¶ 41.)

Here, the City does not oppose or disavow Counselor Plaintiffs' proffered interpretation of the Public Accommodation Ordinance in this regard. To the extent Counselor Plaintiffs allege in the verified complaint that they have a policy and practice of not using requested pronouns that are inconsistent with a client's sex and that they would like to continue to do so and to only refer to clients and prospective clients using pronouns that align with the client's sex, they have sufficiently alleged that their speech is chilled, regardless of whether they otherwise use first names. Counselor Plaintiffs allege that by declining to use a client's preferred pronoun when it is inconsistent with the client's sex, the City's Public Accommodation Ordinance is violated. At this

---

[7] In Count 2, Counselor Plaintiffs assert that the Public Accommodation Ordinance violates their First Amendment free-speech rights by compelling or restricting two categories or buckets of their purported "speech: their *counseling speech* (that is, the substance of the counseling that they provide) and their *general speech* (that is, the pronouns by which they refer to clients, potential clients, and the public). The Court will accordingly distinguish Counselor Plaintiffs' free-speech challenges to the Public Accommodation Ordinance asserted in Count 2 in this manner.

juncture—and with little discussion of these issues otherwise by the parties—the Court is persuaded that Counselor Plaintiffs have satisfied Article III's standing requirement for the pleadings and preliminary injunction phase.

### iii. Conclusion

The Court emphasizes that an injury-in-fact question is not to be conflated with a merits question. Ultimately, questions such as whether the counseling provided by Counselor Plaintiffs should be considered protected speech under the First Amendment—or instead, whether counseling services can, consistent with the First Amendment, be regulated as professional conduct and *not* speech—go to the merits question of whether Counselor Plaintiffs can demonstrate that the challenged ordinances are unconstitutional under the First Amendment. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749-50 (8th Cir. 2019) (finding that a First Amendment plaintiff sufficiently alleged a cognizable constitutional injury to demonstrate *standing* as separate from the *merits* determination of whether wedding videos are protected as "speech" under the First Amendment). Regardless of whether Counselor Plaintiffs are successful on the merits of their constitutional claims, Counselor Plaintiffs have successfully alleged a cognizable constitutional injury-in-fact. As set out above, Counselor Plaintiffs allege in the verified complaint (and included in the supporting declarations attached to the motion for preliminary injunction) that they have traditionally engaged in counseling or other activities that are arguably prohibited by the challenged ordinances and that they now must refer requests for counseling, when the counseling that they would provide that is consistent with their own religious beliefs, would violate the challenged ordinances. At this initial stage, Counselor Plaintiffs have sufficiently shown a cognizable constitutional injury-in-fact to satisfy Article III.

### 2. Jurisdictional Discovery

Defendants also suggest that jurisdictional discovery may be necessary to determine whether Counselor Plaintiffs in fact practice within the city and county geographical limits such that they are subject to the jurisdiction of challenged ordinances. The Court agrees in principle that jurisdictional discovery continues to be warranted throughout the stages of every case. *See also Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (recognizing that each element of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation" (quoting *Lujan*, 504 U.S. at 561)). At this stage, however, in both the verified

13

complaint and the sworn declarations attached to the motion for preliminary injunction, Counselor Plaintiffs aver that they practice within the proper jurisdictions of Kansas City and Jackson County. The evidence presented by Defendants[8] is not per se contradictory to the verified complaint and sworn declarations in this regard. The verified complaint and the sworn declarations are plainly sufficient here.

### B. State of Missouri's Standing

Defendants also assert that the State of Missouri, acting through the Missouri Attorney General, lacks standing to bring the claims asserted in this litigation. *See also In re Supervalu, Inc.*, 870 F.3d 763, 773 (8th Cir. 2017) ("Each plaintiff's standing must be assessed individually.") It is well settled that "a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating[,] as a volunteer[,] the personal claims of its citizens." *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (collecting cases). Here, the State of Missouri asserts standing based on quasi-sovereign and sovereign interests that it alleges are harmed by the challenged ordinances.

### 1. Quasi-Sovereign Interests

First, the State of Missouri asserts standing based on its quasi-sovereign interest in the health and well-being of its citizens "to sue *parens patriae* on behalf of all Missourians injured by the ordinances," including minors with gender dysphoria and the licensed professionals in Missouri to whom the challenged ordinances apply. (Doc. 31 at 16 (citing Doc. 1 at ¶¶ 9-18).)

In *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982), the Supreme Court held that a state may bring suit *parens patriae* consistent with the Article III standing requirement to the extent the state asserts an injury to a "quasi-sovereign" interest of the state itself. *Id.* at 601. The quasi-sovereign-interest requirement is important because "the concept of *parens patriae* standing . . . does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Id.* In other words, a state does not have standing under the *parens patriae* doctrine if it is merely "a nominal party without a real interest of its own." *Id.*

---

[8] Defendants refer to business- and professional-licensing-related state filings for Counselor Plaintiffs and their practices that include mailing or contact addresses that are not within the City or County limits.

In *Snapp*, the Supreme Court explained of a state's possible actionable quasi-sovereign interests:

> Quasi-sovereign interests . . . are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party. They consist of a set of interests that the State has in the well-being of the populace. Formulated so broadly, the concept risks being too vague to survive the standing requirements of [Article] III: A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant.

*Id.* at 602. The Supreme Court noted that "certain characteristics" of a state's quasi-sovereign interest that could support standing under the *parens patriae* doctrine include "two general categories": "First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607. The Supreme Court recognized, as to the latter, that "federal statutes creating benefits or alleviating hardships create interests that a State will obviously wish to have accrue to its residents," and that "a State does have an interest . . . in assuring that the benefits of the federal system are not denied to its general population." *Id.* at 608. Whatever the quasi-sovereign interest identified, to assert *parens patriae* standing, a state must also allege an "injury to a sufficiently substantial segment of its population," such that a state must allege "more . . . than injury to an identifiable group of individual residents." *Id.* at 607.

The parties' briefing is essentially barren on the issue of the application of *parens patriae* standing of a state to sue a defendant under 42 U.S.C. § 1983 for alleged constitutional violations, other than citing *Snapp*. In support of *parens patriae* standing, the State of Missouri cited for the first time at oral argument *Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir. 1981) (en banc). In that pre-*Snapp* case, the Third Circuit en banc found that the Commonwealth had sufficient standing to sue *parens patriae* to bring a civil rights lawsuit against a municipality seeking injunctive relief under the Fourteenth Amendment for alleged violations of citizens' constitutional rights by the local police force. In so doing, the Third Circuit recognized the Commonwealth's "significant sovereign interests . . . in the prevention of future violations of constitutional rights of its citizens, in circumstances in which it cannot reasonably anticipate that private enforcement will achieve the protection of those sovereign interests." *Id.* at 316; *see id.* at 315 (recognizing the Commonwealth's sovereign interests in ensuring "compliance with the standard of conduct laid down in the fourteenth amendment" and "in the prevention of lawless exercises of the powers its

15

laws confer upon police officers hired by its subdivisions," as well as to "prevent[] . . . physical abuse which may cause serious personal injury" to individuals within its territory).

Post-*Snapp*, however, and notwithstanding *Porter* and its progeny, federal courts otherwise appear to generally agree that without something more, *parens patriae* standing does not support a civil rights claim under § 1983 where the state's interest is solely to secure or vindicate the constitutional rights of some of its citizens.

In *Rosenblum v. Does 1-10*, 474 F. Supp. 3d 1128 (D. Ore. 2020), for example, the district court found that the State of Oregon did not have standing under the doctrine of *parens patriae* based on a theory of a First-Amendment chilled-speech harm from alleged unconstitutional seizures of individuals by federal officers deployed to protect federal property in response to civil rights protests near a federal courthouse. The district court declined to find that the state's assertion of a quasi-sovereign interest in securing Oregonians' First Amendment constitutional rights to freedom of speech and freedom of assembly satisfied *Snapp*'s quasi-sovereign-interest requirement of *parens patriae* standing, reasoning that "the state's interest [must] be more than a nominal interest in an individual dispute." *Id.* at 1135. The district court found in that case that Oregon "has not explained . . . why the chilled speech it alleges here injures the state in a way that is distinct from the individual harms that it also alleges [i.e., the civil well-being of its citizens]." *Id.* at 1136; *see Chapman v. Tristar Prods., Inc.*, 940 F.3d 299, 306 (6th Cir. 2019) (finding that *Snapp*'s requirement of a quasi-sovereign interest to support *parens patriae* standing is not satisfied where "the only injury alleged is injury to an identifiable group of [state citizens]" without showing as well "indirect effects of this alleged injury on [the state] as a whole"); *Bd. of Sup'rs of Fairfax Cnty. v. United States*, 408 F. Supp. 556, 566 (E.D. Va. 1976) (observing that to the extent the operation of a prison facility maintained and operated by the District of Columbia violated county inhabitants' constitutional rights—and even assuming the county could sue *parens patriae*—"it could not [sue] . . . to redress the constitutional torts" as the alleged injury to residents' constitutional rights "would be personal to those residents so effected rather than to any quasi-sovereign interest of the county itself"); *but see In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 398-99 (S.D.N.Y. 2021) (finding that the state of New York did have *parens patriae* standing to bring claims under § 1983 against the City of New York, among others, challenging as unconstitutional various practices and policies of the NYPD relating to protests, relying in relevant part on *Porter*).

16

This principle is also similarly applied in the context of tribal law.[9] In *Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076 (9th Cir. 2019), for example, the Ninth Circuit held that the Chemehuevi Indian Tribe could not "assert its members' individual rights as *parens patriae* in a § 1983 action," reasoning that the requirement of *parens patriae* standing that the Tribe must "articulate an interest apart from the interest of particular private parties . . . is inconsistent with a § 1983 action: quasi-sovereign interests are not individual rights." *Id.* at 1082. Earlier, in *United States v. Santee Sioux Tribe of Nebraska*, 254 F.3d 728 (8th Cir. 2001), the Eighth Circuit applied similar reasoning as the Ninth Circuit did in *McMahon*. Specifically, in *Santee Sioux Tribe of Nebraska*, the Eighth Circuit found that the Tribe's assertion of *parens patriae* standing failed because the standing doctrine "is reserved for actions which are asserted on behalf of *all* of the sovereign's citizens," and so it "cannot be used to confer standing on the Tribe to assert the rights of a dozen or so members of the Tribe." *Id.* at 734 (citing *Kickapoo Traditional Tribe of Texas v. Chacon*, 46 F. Supp. 2d 644, 652 (W.D. Tex. 1999);[10] other citation omitted).

More recently, the Fifth Circuit considered whether a state could bring constitutional claims against a subordinate political subdivision of the state as *parens patriae* in *Harrison v. Jefferson Parish School Board*, 78 F.4th 765 (5th Cir. 2023). In that case, the State of Louisiana sued a local parish school board, in part alleging that the school district's virtual discipline policy violated the Fourteenth Amendment Due Process Clause. On appeal, the Fifth Circuit considered whether Louisiana had standing to sue *parens patriae* based on the state's "quasi-sovereign interest in preventing its political subdivisions from violating the constitutional rights of 52,000 public schoolchildren." 78 F.4th at 772. The court of appeals found that Louisiana did not have standing to sue because the state's "asserted interest is wholly derivative of the interests of [the local school board]'s students," and the state failed to "assert[] a separate injury such as being denied *its* full participation in the federal system, . . . [or] injury to its citizens health or economic well-being in a way that also implicates *its own* interests." *Id.* at 773 (emphasis added). The Fifth Circuit reasoned that "individual students can sue to get relief from [the local school board]'s alleged

---

[9] As a sovereign akin to a state, an Indian Tribe can sue *parens patriae*.

[10] In *Kikapoo*, the district court recognized that "cases in which the *parens patriae* doctrine applies have been limited to those involving the rights of tribe members as a whole, and not just one or several members," and so the Kickapoo Traditional Tribe of Texas could not assert as *parens patriae* a claim under the First Amendment "because the rights which it seeks to assert are primarily those of a small group of tribe members . . . and not those of the Tribe as a whole." 46 F. Supp. 2d at 652.

discrimination" and, moreover, that "Louisiana has the power to right [the local school board]'s violations without the help of the federal courts." *Id.*

One year later, in *Paxton v. Dettelbach*, 105 F.4th 708 (5th Cir. 2024), the Fifth Circuit reaffirmed the principles of *parens patriae* standing it had applied in *Harrison*. In that case, the State of Texas sought to bring a § 1983 lawsuit challenging an ATF regulation involving firearm suppressors based on an asserted quasi-sovereign interest in its citizens' health and well-being. The Fifth Circuit rejected the State's lawsuit, reasoning that Texas failed to "show[] that the challenged statutes implicate the State's *own* interests in addition to and apart from the interest of particular private parties" in that "Texas's asserted quasi-sovereign interest is wholly derivative of the personal Second-Amendment interests of its citizens and therefore not a valid quasi-sovereign interest at all." *Id.* at 715-16 (citing *Harrison*).

*Parens patriae* standing "is a judicially created exception that has been narrowly construed." *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335 (1st Cir. 2000). The Eighth Circuit has long recognized, even before *Snapp*, that "[s]uits by a sovereign in the Parens patriae capacity have traditionally been limited to certain narrow areas." *Pfizer, Inc. v. Lord*, 522 F.2d 612, 616 (8th Cir. 1975). The verified complaint here alleges that the State of Missouri has a quasi-sovereign interest in the "suppress[ion]" and "[c]ensoring" of counselor's speech "in the context of minors with gender dysphoria" because conversion therapy can help minors struggling with gender dysphoria by "integrat[ing] their gender identity with their sex and [thus] avoid[ing] the need to undergo surgeries or pharmacological interventions." (Doc. 1 at ¶¶ 12, 13.) The Court is not persuaded that the State of Missouri has identified an adequate quasi-sovereign interest to support *parens patriae* standing.

At base, the claims, harm, and interest identified by the state here—grounded in constitutional free-speech and free-exercise rights protected under the First Amendment—do not "implicate the State's *own* interests in addition to and apart from the interest of particular private parties," *Paxton*, 105 F.4th at 715, whether as to local counselors themselves or even as to local minors struggling with gender dysphoria. The quasi-sovereign interest recognized by the Supreme Court in *Snapp* as to the health and well-being of a state's citizens is not a blank check. *Parens patriae* standing does not allow Missouri to "merely litigate[,] as a volunteer[,] the personal [constitutional] claims of its citizens." *Id.* at 716.

The health-and-welfare interest the State identifies for minors struggling with gender dysphoria—their ability to receive conversion therapy—is intrinsic in the First Amendment issues raised by Counselor Plaintiffs here. Indeed, as counsel for Counselor Plaintiffs suggested at the preliminary injunction hearing, the First Amendment free-speech rights asserted—specifically, to provide counseling to the extent counseling is speech—are indistinguishably reciprocal to the First Amendment rights of clients or potential clients (including minors struggling with gender dysphoria) to receive conversion therapy (to the extent counseling is protected speech). "[I]t is hard to think of a more personal interest," *id.*, than one's ability to provide (or receive) counseling to alter or change a minor's sexual orientation or gender identity to be consistent with a minor's sex, particularly in light of one's personal religious beliefs. Accordingly, the Court finds that the requirements of *parens patriae* standing to assert a separately cognizable quasi-sovereign interest beyond individual civil rights is not satisfied here.[11]

## 2. Sovereign Interests

In addition to *parens patriae* standing, the State of Missouri also argues that it has standing to sue based on the harm imposed by the challenged ordinances to its sovereign interests. Specifically, the State of Missouri argues that the challenged ordinances harm its sovereign interest

---

[11] Prior to oral argument held on May 14, 2025, the State of Missouri submitted a "Notice of Supplemental Authority," (Doc. 46), citing for the first time a "recent decision rendered in another circuit" of which counsel had only just become aware, *New York ex rel. James v. Niagara-Wheatfield Central School District*, 119 F.4th 270 (2d Cir. 2024). The Court notes that *Niaga-Wheatfield* was issued almost six months prior to the filing of Plaintiffs' last brief filed in this case on April 14, 2025, (Doc. 31). Nevertheless, the Court finds *Niagara-Wheatfield* less persuasive for several reasons. First, it is not binding authority. Second, although the Second Circuit found that the state had alleged a sufficient quasi-sovereign interest, the court of appeals did so without any opposition from the defendant-school-district as to that issue of *parens patriae* standing. *See id.* at 279 (noting that the defendant-school-district's *only* challenge to *parens patriae* standing was to the *parens patriae* requirement that the asserted quasi-sovereign interest impact or involve a substantial segment of the sovereign's population). Third, the asserted quasi-sovereign interest— "the health and welfare . . . of students exposed to gender-based violence and harassment whether as victims, perpetrators, or bystanders and their families"—was supported by allegations that the school district failed to address repeated complaints of harassment, violence, and bullying, thus "indicat[ing] to all students that the School District will not protect *them* from sexual assault, harassment, or gender-based bullying" and "signaling to all of its members that the School District personnel will not act to ensure student safety." *Id.* at 277. Fourth, and finally, rather than a § 1983 claim, the State of New York brought suit as *parens patriae* under Title IX of the Education Amendments of 1972 prohibiting sex discrimination in an education program or activity receiving federal funding alongside a state-law claim for negligent supervision. If for no other reason, as explained in the text above, the Court is not persuaded that the State of Missouri has articulated or set forth any quasi-sovereign interest separate and apart from individual constitutional rights sufficient to support *parens patriae* standing in this § 1983 action in a similar manner as New York alleged in *Niagara-Wheatfield*.

19

in "protecting its laws" to the extent the State's "policy of favoring" conversion therapy is codified in state law.[12] The State of Missouri similarly argues that the challenged ordinances "impede Missouri law by preventing counselors" from counseling minor children to re-align their sexual orientation or gender identity with their sex, which is consistent with Missouri's "clear policy." Finally, the State of Missouri asserts that it has a "strong [sovereign] interest in the free speech rights of professionals licensed under its regime."

In *Snapp*, the Supreme Court recognized that a state may have sufficient standing to satisfy Article III based on a sovereign interest that "involves the [state's] power to create and enforce a legal code, both civil and criminal." 458 U.S. at 601.[13] In *Harrison*, the Fifth Circuit recognized that federal courts generally construe this kind of sovereign injury (for constitutional standing purposes) as arising when "the acts of the defendant . . . invade the government's sovereign right [to exercise sovereign power over individuals and entities within its jurisdiction] resulting in some tangible interference with [the state's] authority to regulate or to enforce its laws." 78 F.4th at 770 (cleaned up). In *Saginaw County v. STAT Emergency Medical Services, Inc.*, 946 F.3d 951 (6th Cir. 2020) (cited by the Fifth Circuit in *Harrison*), for example, the Sixth Circuit recognized that the mere "violat[ion] of a law . . . does not by itself injure the government in an Article III way," but that "[o]nly actual or threatened interference with its authority" does so. *Id.* at 956 (cleaned up). The Court finds that this reasoning is more consistent with *Snapp* and Article III's injury-in-fact requirement than the state's proposed broad and largely unfettered construction to the extent that Article III requires an "actual" and "concrete" controversy between a state and a defendant. *See Snapp*, 458 U.S. at 602.

The State of Missouri does not persuasively argue here that the challenged ordinances conflict with or tangibly interfere with Missouri law sufficient to demonstrate an Article III injury-

_____

[12] The State of Missouri suggests that a "policy" favoring conversion therapy is codified in state law to the extent Missouri law otherwise prohibits hormonal and surgical interventions on minors to enable them to identify as the opposite sex. *See* Missouri Save Adolescents from Experimentation (SAFE) Act, Mo. Rev. Stat. § 191.1720 (prohibiting health care providers from performing gender transition surgery on minors and prescribing or administering cross-sex hormones or puberty blocking drugs for gender transition involving a minor).

[13] Although the Supreme Court in *Snapp* recognized the concept of state standing based on a sovereign interest, the Court in that case only considered Puerto Rico's standing as *parens patriae* and its asserted quasi-sovereign interest and did not otherwise consider or address the contours of state standing based on alleged harm to a sovereign interest.

in-fact to bring constitutional claims against the City and County under § 1983 challenging the Counseling Ordinances and the Public Accommodation Ordinance. *See State of Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir. 1998) ("A role as lawmaker does not confer a role as litigant in federal court.");[14] *cf. Texas v. Becerra*, 623 F. Supp. 3d 696, 714 (N.D. Tex. Aug. 23, 2022) (finding that the State of Texas did have standing to bring suit against a federal agency to the extent guidance promulgated by the federal agency interpreted federal law to supersede and preempt state law and thus "interfere[ed] with Texas's enforcement of its laws because it encouraged its hospitals and doctors to violate Texas abortion laws under threat of [federal] liability," therefore "giv[ing] Texas hospitals and physicians license—much more, requir[ing] them—to violate Texas abortion laws"). The State of Missouri simply has not alleged or demonstrated that the challenged ordinances materially conflict with or inhibit the State's enforcement of either its professional licensing regime or its law prohibiting pharmacological and surgical interventions for gender transitions of minors to demonstrate state standing.[15] Instead, the State's argument that a sovereign interest is implicated is simply an unpersuasive re-packaging of the quasi-sovereign interest

---

[14] To proceed as a party plaintiff in this § 1983 action and to affirmatively assert constitutional claims against two political subdivisions of the state itself, the State of Missouri—as any other plaintiff in federal court—must satisfy Article III standing. The Court notes, however, that as itself a sovereign, the State of Missouri is not without any potential remedy to the extent it disagrees with the local laws enacted by the City and the County here, whether on policy grounds or otherwise. *See* Evy Lewis, *Missouri Legislature passes bill allowing landlords to discriminate against low-income renters*, KCUR (May 8, 2025), https://www.kcur.org/housing-development-section/2025-05-08/missouri-legislature-housing-discrimination-section-8-vouchers (noting that the Missouri General Assembly passed a law prohibiting cities from banning source-of-income discrimination in response to local legislation banning source-of-income discrimination).

[15] The Court notes that the State of Missouri's argument is premised on the notion that the necessary inverse of the state law prohibiting pharmacological and surgical interventions for a minor to pursue gender transition is counseling to align (or re-align) the minor's sexual orientation or gender identity with their sex. It is not clear to the Court, though, that this is necessarily true. In other words, granting Missouri's argument that its prohibition of pharmacological or surgical interventions necessarily points to counseling or therapy as the preferred intervention, it is not clear that—going a step further—the inverse of the state policy is *conversion therapy* (i.e., counseling specifically *to change* a minor's sexual identity or gender orientation). Nevertheless, the State of Missouri has not persuasively argued that to the extent the challenged ordinances prohibit conversion therapy, doing so necessarily and affirmatively impedes the State of Missouri's enforcement of either its professional-licensing regime or its law prohibiting pharmacological or surgical gender transitions for minors. In addition, the Court is somewhat skeptical that impeding or interfering with a state's "clear policy," as opposed to impeding or interfering with a state's enforcement of its substantive law could support a state's standing to sue under the sovereign-interest doctrine in light of Article III's injury-in-fact requirement.

21

discussed above.[16]  The constitutional First Amendment rights of minors or counselors, without something more, does not satisfy the Article III standing doctrine that requires an injury-in-fact for the State of Missouri to sue as a party plaintiff here.

### C.    Conclusion

As explained above, the Court finds that although Counselor Plaintiffs have sufficiently demonstrated a cognizable injury-in-fact at this early stage of litigation to satisfy Article III's standing requirement, the State of Missouri has not.  Accordingly, the State of Missouri is dismissed a party plaintiff in this action.

## III.  Preliminary Injunction

Having found that Counselor Plaintiffs have adequately demonstrated Article III standing to proceed at this juncture, the Court turns to Counselor Plaintiffs' motion for preliminary injunction.[17]

### A.    Legal Standard

The Eighth Circuit considers motions for preliminary injunctions based on the following factors: (1) the threat of irreparable harm to the plaintiff, (2) the state of balance between such harm and the injury that granting the injunction will inflict on other parties, (3) the probability the plaintiff will succeed on the merits, and (4) the public interest.  *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "Likelihood of success on the merits is the most important factor . . . ."  *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022).

"Under the third *Dataphase* factor, parties seeking to preliminarily enjoin the implementation of a state statute must demonstrate that they are likely to prevail on the merits." *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (internal quotation marks omitted); *see Carlson v. City of Duluty*, 958 F. Supp. 2d 1040, 1060 (D. Minn. 2013) (applying the "likely to prevail" standard to a constitutional challenge to a city ordinance); *Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge*, 914 F. Supp. 2d 1041, 1045 (E.D. Mo. 2012) (same).  When a

---

[16] Or perhaps the State of Missouri's quasi-sovereign-interest argument is a repackaging of its asserted sovereign interest.  Either way, the Court is not persuaded that the State of Missouri has adequately alleged or set forth any cognizable quasi-sovereign or sovereign interest sufficient to satisfy Article III's standing requirement for it to bring suit as a plaintiff in this § 1983 action.

[17] While the Court separately addresses Defendants' motion to dismiss arguments in § IV, below, the Court considers all arguments in Defendants' joint motion to dismiss/opposition brief to the preliminary injunction motion as may be relevant to Counselor Plaintiffs' motion for preliminary injunction.

plaintiff demonstrates "a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are . . . deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (internal quotation marks omitted). In all other circumstances, to show a sufficient likelihood of success on the merits to obtain a preliminary injunction, a plaintiff need only show a "fair chance" of success. *Rodgers*, 942 F.3d at 455.

### B. Counselor Plaintiffs' First Amendment Claims

#### 1. First Amendment Jurisprudence

Under the First Amendment, the government (including local governments) may not "abridge[e] the freedom of speech." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019). The Free Speech Clause is "at the core of our democratic society." *Phelps-Roper v. City of Manchester*, 679 F.3d 678, 686 (8th Cir. 2012). The freedom of speech protected by the First Amendment "promotes the free exchange of ideas by allowing people to speak in many forms and convey a variety of messages, including those that invite dispute and are provocative and challenging." *Telescope Media Grp.*, 936 F.3d at 750 (internal quotation marks omitted). The First Amendment does not protect speech or spoken language for the sake of speech or spoken language, but rather "reflects the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocates v. Becerra* ("*NIFLA*"), 585 U.S. 755, 766 (2018) (internal quotation marks omitted).

This case involves a First Amendment free-speech challenge to two different categories of local laws: (1) health and welfare laws applicable only to certain professions/professionals (Counseling Ordinances), and (2) anti-discrimination laws applicable to all public accommodations generally (Public Accommodation Ordinance). As to the Counseling Ordinances, the controlling question is whether the ordinances regulate counseling as professional conduct (even though doing so incidentally burdens speech) *or* whether the ordinances regulate counseling as speech, in the vein of *NIFLA*, applying *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.). As set forth more fully below, the Court finds that the Counseling Ordinances likely regulate counseling as professional *conduct*, and therefore, are subject to a lesser standard of review than strict scrutiny. By comparison, as to the Public Accommodation Ordinance, the controlling

23

question asks whether Counselor Plaintiffs' counseling or Counselor Plaintiffs' use of pronouns (*see* note 8, above) is "pure speech," in the vein of *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023).  In this regard, the Court finds that the Public Accommodation Ordinance as applied to Counselor Plaintiffs' *counseling* <u>likely does not</u> regulate "pure speech," but that as applied Counselor Plaintiffs' *pronoun usage*, the Public Accommodation Ordinance <u>likely does</u> regulate "pure speech."  Accordingly, applying strict scrutiny, the Court concludes only that the Public Accommodation Ordinance as applied to Counselor Plaintiffs' *pronoun usage* likely violates their free-speech rights.

### 2.    Counseling Ordinances:  Professional Conduct Exception

As stated above, Plaintiffs argue that the Counseling Ordinances violate the First Amendment because their counseling is "speech" that is protected under the First Amendment.  They argue that strict scrutiny applies because counseling necessarily involves verbal communication through spoken language—in that it "consists only of written and spoken words," (Doc. 10 at 17)—and therefore is protected as "speech" under the First Amendment.  Put another way, their theory asserts that the challenged ordinances "prohibit counseling where *speech is the therapy* . . .*"  (*Id.* at 29.)  Counselor Plaintiffs argue that because the Counseling Ordinances regulate (or restrict) their protected speech and are content-based or discriminatory based on viewpoint, the ordinances are subject to the high bar of strict scrutiny review.  Defendants, on the other hand, argue that while counseling involves speech, the Counseling Ordinances permissibly regulate professional conduct and only incidentally burdens speech in the vein of *Casey* (as recognized by the Supreme Court in *NIFLA*) and are, accordingly, subject only to rational basis review.  (Doc. 20 at 26-28.)

As noted above, Counselor Plaintiffs start from the proposition that to the extent counseling or talk therapy wholly consists of written and spoken words, it must be considered "speech" that is protected under the First Amendment.  In short, "speech is the therapy."  In *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), as emphasized by Counselor Plaintiffs, the Eleventh Circuit took a similar approach in analyzing a First Amendment challenge to city and county ordinances in Florida also banning conversion therapy regarding minors.  In finding that the ordinances were unconstitutional under the First Amendment as a content-based regulation of speech that failed strict scrutiny, the Eleventh Circuit reasoned that counseling "consists—entirely—of words," and applied circuit precedent holding that "[s]peech is speech, and it must be analyzed as such for

24

purposes of the First Amendment." *Id.* at 965, 866 (quoting *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc)).[18]

Counselor Plaintiffs then argue what counseling or talk therapy is *not*, i.e., that it is not merely "conduct," primarily relying on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). In *Holder*, the Supreme Court found that a federal law which made it unlawful to "knowingly provide material support or resources to a foreign terrorist organization" did not violate the plaintiffs' First Amendment free-speech rights. There, the plaintiffs asserted an as-applied challenge to the material-support law in that they sought to provide, *inter alia*, legal and political advocacy and advocacy training[19] to two organizations designated by the U.S. State Department as foreign terrorist organizations—training that they asserted would be unlawful under the material-support statute. *Id.* at 9, 10; *see id.* at 14-15 (recognizing that the plaintiffs specifically sought to (1) train members how to use humanitarian and international law to resolve disputes; (2) engage in political and legal advocacy on behalf of the ethnic groups supported by the organizations; and (3) teach members how to petition various representative bodies including the United Nations for relief). The Supreme Court in *Holder* ultimately rejected the government's argument that "the only thing actually at issue in this litigation is conduct," reasoning that "as applied to plaintiffs, the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 27, 28. And thus, Counselor Plaintiffs argue, so it is here. That is, as in *Holder*, the Counseling Ordinances should properly be understood to regulate speech as speech because the ordinances are triggered by speech (counseling or talk therapy) concerning specific

---

[18] In *Wollschlaeger*, the Eleventh Circuit en banc considered the constitutionality of a state law that (1) prohibited a doctor or medical professional's record-keeping or inquiry concerning a patient's firearm ownership and (2) prohibited discrimination against a patient based on the patient's ownership and possession of a firearm. The Eleventh Circuit concluded that these provisions "constitute speaker-focused and content-based restrictions on speech," reasoning that they "expressly limit the ability of certain speakers—doctors and medical professionals—to write and speak about a certain topic—the ownership of firearms—and thereby restrict their ability to communicate and/or convey a message." *Wollschlaeger*, 848 F.3d at 1307. The court of appeals rejected the State's argument in that case that "the First Amendment is not implicated because any effect on speech is merely incidental to the regulation of professional conduct," reasoning that "[s]aying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation." *Id.* at 1308.

[19] The law defined "material support" as including "training, [and] expert advice or assistance . . ." *Holder*, 561 U.S. at 8 (quoting 18 U.S.C. § 2339A(b)(1)). "Training" was further defined to mean "instruction or teaching designed to impart a specific skill, as opposed to general knowledge," and "expert advice or assistance" was further defined as meaning "advice or assistance derived from scientific, technical or other specialized knowledge." *Id.* at 12-13 (quoting § 2339A(b)(2), (3)).

25

communicative content (the substance of their counseling, i.e., conversion therapy to change a minor's sexual orientation or gender identity). Counselor Plaintiffs emphasize in this regard that "[s]peech is not conduct just because the government says it is." *Telescope Media Grp.*, 936 F.3d at 752.

More instructive here than *Holder*, however, and as cited by both parties, the Court carefully considers the Supreme Court's opinion in *NIFLA*. In that more recent case, the Supreme Court considered a First Amendment challenge to a California state law requiring, in part, that licensed health clinics with the primary purpose of providing family planning or pregnancy-related services post, print, and distribute a government-drafted notice about the availability of state-sponsored family planning services (including abortion). Below, the Ninth Circuit had found that the licensed-notice requirement did not violate the First Amendment after applying circuit precedent holding that a "'lower level of scrutiny' . . . applies to regulations of 'professional speech'" as a separate category of protected speech under the First Amendment. *NIFLA*, 585 U.S. at 765.

The Supreme Court in *NIFLA*, however, declined to recognize "professional speech" as a "separate category of speech," noting that "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *Id.* at 767.[20] In doing so, the Supreme Court recognized that although established First Amendment jurisprudence has "afforded less protection for professional speech in two circumstances," the less protection afforded in those cases did not "turn[] on the fact that the professionals were speaking." *Id.* at 768. One such circumstance that the Supreme Court continued to recognize in *NIFLA* as subject to a lesser standard of review under the First

---

[20] Specifically, the Supreme Court declined to recognize professional speech as a category of speech that automatically receives "diminished constitutional protection," reasoning that "[t]his Court's precedents do not recognize such a tradition for a category called 'professional speech,'" but instead have generally "long protected the First Amendment rights of professionals." 585 U.S. at 768, 771. At the same time, however, the Supreme Court did not ultimately decide that the First Amendment may never apply differently to "professional speech" as a category of speech subject to a standard of review less than strict scrutiny, *id.* at 773 ("We do not foreclose the possibility that some such reason [for treating professional speech as a unique category that is exempt from ordinary First Amendment principles] exists."), but recognized that it need not decide the question in *NIFLA* "because the licensed notice cannot survive even intermediate scrutiny," *id.*, the very same standard of review the Ninth Circuit had applied below to analyze the constitutionality of the challenged licensed-notice law, *see National Institute of Family and Life Advocates v. Harris*, 839 F.3d 823, 836-37 (9th Cir. 2016).

Amendment is the regulation of professional conduct that incidentally involves (or burdens) speech. *Id.* (citing *Casey*, 505 U.S. at 884; other citation omitted).[21]

The *NIFLA* Court explained of *Casey*, in particular: "[In *Casey*], this Court upheld a law requiring physicians to obtain informed consent before they could perform an abortion," and in doing so reasoned that "the law regulated speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State.'" *Id.* at 770 (quoting *Casey*, 505 U.S. at 884) (emphasis added in *NIFLA*); *see id.* at 782 (Breyer, J., dissenting) (recognizing that the majority "excepts [from the general First Amendment rule that strict scrutiny applies to content-based regulation of speech] laws that 'regulate professional conduct' *and* only 'incidentally burden speech'").

The Supreme Court in *NIFLA* then found that the professional-conduct exception from ordinary First Amendment principles earlier recognized and applied in *Casey* did not apply to the licensed-notice requirement at issue in *NIFLA*:

> The licensed notice at issue here is not an informed-consent requirement *or any other regulation of professional conduct*. The notice does not facilitate informed consent to a medical procedure. In fact, *it is not tied to a procedure at all. It applies to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed.* If a covered facility does provide medical procedures, the notice provides no information about the risks or benefits of those procedures. . . . <u>The licensed notice regulates speech as speech</u>.

*Id.* at 770 (emphasis added).

Counselor Plaintiffs favorably parse *NIFLA* and do not fully engage with the opinion to the extent it recognized the professional-conduct exception previously applied by the Supreme Court in *Casey*. First, they argue that asking whether the professional-conduct exception applies here "get[s] the analysis backwards" because "*NIFLA* didn't start there," but first determined whether the challenged law was a content-based regulation of speech. (Doc. 31 at 22.) This argument is not persuasive. As explained above, the Supreme Court in *NIFLA* determined that the professional-conduct exception it had previously applied in *Casey* did not apply to the challenged licensed-notice requirement. In doing so, the Supreme Court did not reason that the professional-conduct exception did not apply because the licensed-notice requirement was a content-based regulation of speech. Instead, the Supreme Court distinguished the licensed-notice requirement in

---

[21] The other circumstance concerned regulations "requir[ing] professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *NIFLA*, 585 U.S. at 768.

27

*NIFLA* as regulating speech as speech and not as regulating professional conduct. The professional-conduct exception is just that—an exception to the ordinary First Amendment framework that would otherwise apply. To suggest that the order of analysis set forth by the Supreme Court in *NIFLA* is somehow determinative is less-than-persuasive legal reasoning. Instead, the question here is the same question that was before the Court in *NIFLA*: whether the professional-conduct exception applies to the Counseling Ordinances. If it does, then it operates as an exception to the ordinary First Amendment principles and the ordinances would be subject to a lesser standard of review. If it does not, as the Supreme Court found of the licensed-notice requirement in *NIFLA*, the ordinary First Amendment principles apply such that if the challenged ordinances are content-based or discriminate based on viewpoint, then they are subject to the high bar of strict scrutiny review.

Counselor Plaintiffs also suggest that *Casey* should be understood as only applying to a free-speech challenge to an informed consent law. The Court also disagrees with this argument. Certainly, *Casey* considered a constitutional free-speech challenge to an informed-consent law. Nothing in that opinion, however—or, maybe more importantly, in the Supreme Court's subsequent discussion and application of *Casey* in *NIFLA*—suggests that the First Amendment principle encompassed in the professional-conduct exception to ordinary First Amendment principles applies *only* to informed consent laws. *Cf. NIFLA*, 585 U.S. at 770 (reasoning that *Casey* did not dictate the outcome of the constitutional challenge to the licensed-notice requirement because it was not "an informed-consent requirement . . . or any other regulation of professional conduct"). To be sure, Counselor Plaintiffs expressly acknowledge in their briefing that, consistent with the First Amendment, "governments still have wide latitude to regulate professionals," giving as examples that:

> [the government] can (i) compel speech incidental to actual conduct—like informed consent (speech) requirements related to physical interventions (conduct); . . . (iii) regulate non-expressive conduct, like violence, malpractice, fraud, and much else; (iv) impose countless content-neutral licensing requirements; (v) regulate written medical prescriptions and other speech with 'an independent legal effect . . . .'"

(Doc. 31 at 21.) Many of these principles flow from or at the very least are entirely consistent with the professional-conduct exception applied in *Casey* and recognized by the Supreme Court in *NIFLA*.

28

In a similar manner, Counselor Plaintiffs also suggest that a critical reason why informed consent laws are constitutional is because they required physicians to provide patients with information relevant to a "non-expressive 'medical procedure.'" (Doc. 31 at 22.) In other words, Counselor Plaintiffs suggest that the professional-conduct exception applies only to medical procedures or treatments since they are "non-expressive" and are "concrete physical actions." (Doc. 10 at 18.) Thus, Counselor Plaintiffs argue in the inverse that their counseling cannot be regulated or that the Counseling Ordinances cannot be construed as a permissible regulation of professional conduct in the vein of *Casey* because, in their view, their counseling is both "expressive" and concerns an individual's mental or emotional health (i.e., is not "physical"). The Court is not persuaded by this argument, either, for the reasons explained below.

Finally, Counselor Plaintiffs suggest that the professional-conduct inquiry is inconsistent with or contradictory to *NIFLA* to the extent the Supreme Court in *NIFLA* did not recognize "professional speech" as a separate category of speech. (Doc. 31 at 22.) *See also Otto*, 981 F.3d at 861 (noting that "the first question we need to consider is whether the ordinances are content-based regulations [of speech]," and rejecting the argument by the local governments that the ordinances are "professional regulations" subject to a lower level of scrutiny). The Court is again not persuaded. Counselor Plaintiffs do not suggest that *Casey* is not good law on this point. Nor did the Supreme Court suggest as much in recognizing (and distinguishing) *Casey* in *NIFLA*. "Reasoning based on a line of Supreme Court precedents that the Court itself emphasizes in a later decision is not implicated by that later decision cannot have been rejected, overruled, or abrogated by the later decision." *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022). The Court accordingly finds that *Casey* is applicable here. *See Stenberg v. Carhart*, 530 U.S. 914, 952 (2000) (Rehnquist, C.J., dissenting) (recognizing that "the *Casey* joint opinion represents the holding of the Court in that case") (citing *Marks v. United States*, 430 U.S. 188 (1977)). And more to the point, the Court considers (as did the Supreme Court in *NIFLA*) whether the professional-conduct exception applies to this free-speech challenge to the Counseling Ordinances.

Although not cited by either party, the Court finds a recent decision by a sister district court in *Brandt v. Rutledge*, 677 F. Supp. 3d 877 (E.D. Ark. 2023),[22] to be instructive as to the underlying

---

[22] *Brandt* is currently pending on appeal before the Eighth Circuit en banc. *Brandt v. Griffin*, No. 23-2681 (8th Cir.). The case was argued before the Court en banc on April 11, 2024.

First Amendment principles at play here and as set out in *NIFLA* especially. In *Brandt*, the district court considered the constitutionality of an Arkansas statute providing that "[a] physician, or other healthcare professional shall not refer any individual under eighteen (18) years of age to any healthcare professional for gender transition procedures." The physician-plaintiff argued that the law unlawfully restricted her First Amendment free-speech rights because it "bar[red] her from referring her patients to other healthcare professionals for gender transition treatment . . ." *Id.* at 923. The district court agreed and rejected the State's argument that the law merely regulates professional conduct rather than any protected communication or speech by healthcare professionals:

> The State argues that writing an order, or "referring," a patient to another physician for gender transition procedures amounts to a treatment order. A treatment order is professional conduct subject to regulation by the State, even if it incidentally involves speech. The State argues that the Act's purpose is to encourage speech in the form of psychotherapy for treatment of gender dysphoria.
>
> . . .
>
> As written, [the statute] clearly regulates speech and not conduct . . . . It prevents doctors from informing their patients where gender transition treatment may be available. It effectively bans their ability to speak to patients about these treatments because the physician is not allowed to tell their patient where it is available. A State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights.

*Id.* at 924 (cleaned up).

The Ninth Circuit applied similar reasoning in *Planned Parenthood Great Northwest Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825 (9th Cir. 2024). In *Labrador*, the plaintiff challenged an Idaho state law that made the performing of an abortion within the state a felony offense and which imposed professional licensing penalties on healthcare professionals who "assist[] in performing or attempting to perform an abortion," a provision that the Idaho Attorney General formally interpreted to prohibit medical providers from "referring a patient across state lines to an abortion provider." *Id.* at 832 (internal quotation marks omitted). The Ninth Circuit affirmed the district court's preliminary injunction order enjoining enforcement of the professional-licensing provision under the State Attorney General's interpretation:

> The professional medical speech at issue here is entitled to at least as much First Amendment protection as other speech. The exception for regulations of professional conduct that incidentally burden speech does not apply here. Section 18-622(1), as interpreted by the Attorney General in the Opinion Letter, is not merely an incidental burden. It directly prohibits medical professionals from

30

> "referring" a patient "across state lines to access abortion services." That is, it prohibits speech that is distinct from the actual provision of treatment.
>
> The Attorney General's interpretation of § 18-622(1) in the Opinion Letter is a content-based restriction on speech because it silences healthcare providers on the specific topic of abortion. The interpretation forbids expression of a particular viewpoint—that abortion services in another state would likely help a patient.

*Id.* at 844 (citing *NIFLA* and *Tingley v. Ferguson*, 47 F.4th 1055, 1076 (9th Cir. 2022); internal quotation marks omitted). *See Zajac v. Statton*, No. 20-2148 (JRT/DTS), 2021 WL 720453, at *5-6 (D. Minn. Feb. 24, 2021) (rejecting argument that an administrative proceeding initiated by the Minnesota Board of Medical Practice for alleged violation of the Minnesota Medical Practice Act concerning physician-plaintiff's patient-counseling involving vaccines—in particular challenging the efficacy and safety of childhood vaccinations—did not infringe physician-plaintiff's First Amendment right to free-speech because the administrative proceeding was brought "to regulate Plaintiff's professional interactions with patients—namely, to bring such interactions in line with what Defendants allege is mandated by the [state medical practice act]—and not to police his public speech"); *Pearson v. McCaffrey*, 139 F. Supp. 2d 113, 121 (D.D.C. 2001) (holding that federal policy prohibiting physicians from prescribing marijuana—but which did not prohibit the physicians' discussion of the use of medical marijuana with their patients—did not raise First Amendment free-speech concerns because "the recommendation and prescription of the drug is a different issue" as part of the physician "engaging in the practice of medicine, which has a long history of being regulated to protect the public safety"; reasoning also that "[t]he fact that speech or writing is the mechanism used by physicians to carry out such a task [of recommending or prescribing medical marijuana] does not make the conduct less violative of federal law" and that "[t]he First Amendment does not prohibit the federal government from taking action against physicians whose prescription or recommendation of medicinal marijuana violates the [Controlled Substance Act]") (internal quotation marks omitted).

Unlike the statutes at issue in *Brandt* and *Labrador*, the Counseling Ordinances are specifically limited to regulating conversion therapy as employed, utilized, practiced, or engaged in by a licensed counselor (among other professional occupations otherwise regulated by the State of Missouri) in professional counseling with a minor client. The language used in *Brandt* and the interpretation applied in *Labrador* were arguably broader in scope to prohibit "referring" patients, and thus prohibiting "speech," than the Counseling Ordinances in this case. Here, the ordinances prohibiting the practice of conversion therapy do not limit Counselor Plaintiffs from informing

31

minor clients about conversion therapy, referring minor clients to other counselors and to where conversion therapy may be available, or otherwise speaking or communicating about conversion therapy generally.[23]  Instead, the Counseling Ordinances prohibit the use of conversion therapy in professional counseling provided to a minor.

As the Court initially set forth, when considering the professional-conduct exception to ordinary First Amendment principles applied in *Casey*, the question here is whether the Counseling Ordinances are more properly understood as regulating professional conduct in a way that incidentally burdens speech (and are therefore subject to a lower level of scrutiny) or whether the Counseling Ordinances regulate speech as speech (and are therefore subject to strict scrutiny).  The Court is persuaded that for purposes of Counselor Plaintiffs' First Amendment challenge to the Counseling Ordinances, the challenged ordinances are better understood as regulating professional conduct than regulating speech as speech.  This conclusion is not an exercise, as Counselor Plaintiffs argue, of engaging in a mere "labeling game."  (Doc. 31 at 20.)  Characterizing what it is that the ordinances regulate—whether "speech" as professional conduct or whether speech as speech—is the critical threshold question to considering Counselor Plaintiffs' free-speech claim.  The distinction is well established within First Amendment jurisprudence.  *See NIFLA*, 585 U.S. at 769 (recognizing that the Court has "long drawn" a distinction between "speech and conduct"); *Masterpiece Cakeshop v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 655 (2018) (Thomas, J., concurring) (acknowledging that in recognizing and applying the Free Speech Clause "this Court has distinguished between regulations of speech and regulations of conduct").

As reflected above, the challenged Counseling Ordinances prohibit conversion therapy as employed or utilized or practiced by a myriad of licensed medical and mental health professionals

---

[23] Counselor Plaintiffs argue in response that having alternative avenues of expression does not mean that the Counseling Ordinances do not violate the First Amendment.  (Doc. 31 at 24.)  The Court agrees with this statement of law in the abstract.  *See Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 541 n.10 (1980) ("we have consistently rejected the suggestion that a government may justify a content-based prohibition by showing that speakers have alternative means of expression") (collecting cases) (as cited by Counselor Plaintiffs).  This argument misses the mark here, however, for similar reasons that Counselor Plaintiffs' argument focusing on whether counseling or talk therapy can be considered "pure speech" misses the mark. The argument presumes that the ordinary First Amendment analysis applies.  But under *Casey*, the applicable First Amendment analysis is different—it looks to whether the Counseling Ordinances regulate counseling or talk therapy as professional conduct or whether they regulate counseling or talk therapy as speech.  The professional-conduct exception to the ordinary First Amendment analysis recognized and applied by the Supreme Court in *Casey* (and *NIFLA*) is just that—an exception to the ordinary analysis.

(broadly, all regulated professionals under Missouri law, which includes counselors, medical doctors, psychiatrists, etc.) in the context of formal counseling or therapy sessions (i.e., as a paid professional service) involving minor clients. In this vein, the Court notes that Missouri law regulates licensed professional counselors and defines the "practice of professional counseling" as:

> rendering . . . to individuals, couples, groups, organizations, institutions, corporations, schools, government agencies, or the general public any counseling service involving the application of counseling procedures, and the principles and methods thereof, to assist in achieving more effective intrapersonal or interpersonal, marital, decisional, social, educational, vocational, developmental, or rehabilitative adjustments.

Mo. Rev. Stat. § 337.500(6). A "licensed professional counselor" is "any person who offers to render professional counseling services . . . for a fee, . . . implying that the person is trained, experienced, and licensed in counseling, and who holds a current, valid license to practice counseling." § 337.500(5). And Missouri law defines "professional counseling" further as including "[t]he use of verbal and nonverbal counseling or both techniques, methods, or procedures based on principles for assessing, understanding, or including behavior," as well as '[t]herapeutic vocational or personal or both rehabilitation in relation to coping with or adapting to physical disability, emotional disability, or intellectual disability or any combination of the three." § 337.500(7)(a), (d).[24]

---

[24] Of course, the challenged local ordinances here were not promulgated by the State of Missouri under this licensing regime. Instead, the ordinances were promulgated under the City and County's general authority to regulate for the general health and welfare of its citizens, *see* Mo. Rev. Stat. § 82.300.1 (Kansas City home rule statute). It is not clear that the City or County necessarily has any similar authority to regulate professionals or to institute a similar licensing regime in the same way as the State of Missouri. Nevertheless, this lawsuit does not raise any question whatsoever to the legal authority by which the City or County promulgated the Counseling Ordinances. And moreover, the Court simply recognizes the state's licensing regime as helpful to answering the First Amendment question presented in this case. Indeed, were the State of Missouri to pass a law under the state licensing regime concerning the same subject matter (whether similarly prohibiting the practice of conversion therapy, requiring that counselors engage in conversion therapy when requested, or providing a religious exemption for counselors in accepting or declining clients, for example), the First Amendment analysis in this regard would substantially be the same. The constitutional principles implicated here—weighing both the state or local government's authority to regulate and to exercise their police powers against individual free-speech rights—apply equally without any political attachment. The Court's constitutional analysis does not (and should not) depend on any political, religious, socio-economic, or any other ideological lens through which the policy at issue is viewed. Our Constitution demands no less.

Counselor Plaintiffs appear to agree that a regulation prohibiting a medical doctor from dispensing drugs, performing surgery, or offering any medical procedure generally would be a valid regulation consistent with *NIFLA* to the extent the Supreme Court continued to recognize the First Amendment framework that applies to regulations of professional conduct that incidentally burden speech. (*See* Doc. 31 at 19.) The difference, Counselor Plaintiffs posit, is that those medical procedures are "separately identifiable from their speech" (or are "physical interventions (conduct)"), whereas counseling and talk therapy necessarily consists in whole of speech or words. (*Id.* at 19, 20, 21.)

The method of talk therapy and the purpose for which it is employed, indeed the valuable professional services and treatment that licensed counselors provide to clients in addressing their mental and emotional health and wellbeing, is not unlike the methods and purposes of a medical doctor in providing a medical treatment such as surgery, a prescription, a treatment order, or any other medical procedure, for their patients' physical health and wellbeing. Licensed counselors are regulated by the State of Missouri in the same way as doctors, dentists, and other medical professionals. It is true that "[s]peech is not conduct just because the government says it is." *Telescope Media Grp.*, 936 F.3d at 752. At the same time, "it has never been deemed an abridgement of [the] freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 62 (2006) (internal quotation marks omitted). That counseling relies on the medium of verbal communication to aid, treat, improve, or support the emotional, mental, or relational well-being of individuals and couples together does not mean that the Counseling Ordinances necessarily regulates counseling as speech. The Court is persuaded that counseling in this regard is more like a prescription or treatment order than not. In other words, the Court finds that rather than regulating counseling as speech, the Counseling Ordinances regulate counseling as professional conduct and only incidentally burdens speech in doing so.

In short, the Court is persuaded that here the professional-conduct exception applied by the Supreme Court in *Casey* and recognized by the Supreme Court in *NIFLA* applies. As a result, to withstand Counselor Plaintiffs' constitutional challenge under the First Amendment Free Speech Clause, the Counseling Ordinances need not satisfy strict scrutiny, but must only satisfy a lesser standard of review. *See NIFLA*, 585 U.S. at 768 (recognizing that "less protection" is afforded for

34

speech under the professional-conduct exception).  In this regard, Defendants assert that the rational basis standard of review applies.  Counselor Plaintiffs argue only that the Counseling Ordinances fail under strict scrutiny.  Because the Court finds that a lesser standard of review applies to Counselor Plaintiffs free-speech challenge to the Counseling Ordinances and because Counselor Plaintiffs do not address any lesser standard of review than strict scrutiny, Counselor Plaintiffs have not satisfied their burden as movants under the motion for preliminary injunction to demonstrate a sufficient likelihood of success on the merits of this free-speech claim.  Counselor Plaintiffs are accordingly not entitled to preliminary injunctive relief in this regard.[25]

### 3. Public Accommodation Ordinance:  Pure Speech

Counselor Plaintiffs also argue that the Public Accommodation Ordinance violates their First Amendment rights as applied to them by both compelling and restricting their speech. Counselor Plaintiffs argue that the Public Accommodation Ordinance violates the First Amendment because it compels them to speak by requiring them to provide counseling or talk therapy that encourages, supports, or promotes ideas, behaviors, or actions that are inconsistent with their own religious beliefs (when their policy and practice is to only provide counseling that is consistent with their religious beliefs).  For example, Counselor Plaintiffs assert that the Public Accommodation Ordinance requires that they provide marital counseling for a same-sex couple and that they provide counseling that endorses views about sexuality or gender identity that do not align with the client's sex.  Counselor Plaintiffs also assert that the Public Accommodation Ordinance requires that they use pronouns inconsistent with a client's sex.  In a similar manner and at the same time, Counselor Plaintiffs argue that the Public Accommodation Ordinance (specifically the Publication Clause) restricts their speech because it prohibits them from publicizing their inability to provide counseling inconsistent with their religious beliefs.  The City argues that the counseling that Counselor Plaintiffs provide is neither "pure speech" nor "expressive activity" that is protected under the First Amendment.

### i. Is counseling "pure speech" that is protected under the First Amendment?

Similar to the free-speech challenge to the Counseling Ordinances, Counselor Plaintiffs' free-speech challenge to the Public Accommodation Ordinance rests on the theory that because the

---

[25] And as set out in § IV.A.1, below, the Court further finds that the Counseling Ordinances survive rational basis review and are therefore constitutional.

35

counseling conversations they have with clients necessarily involves speech or verbal communication, their counseling is protected speech under the First Amendment.[26]  Specifically, they argue that the First Amendment protects the counseling conversations that they have with clients because those counseling conversations necessary involve speech as a medium of communication.  In short, they argue that the First Amendment protects their counseling activities because "their counseling *is their speech*," or put another way, "speech is the therapy."  (Doc. 10 at 22, 29; *see id.* at 14 ("Communicating with others and offering advice and guidance on sensitive topics is quintessential speech."); Doc. 31 at 18 ("Those [counseling] conversations involve speech.  And the First Amendment protects that speech.").)  In support of their free-speech claims as to the Public Accommodation Ordinance, Counselor Plaintiffs primarily rely on two cases analyzing a free-speech challenge to a public accommodations anti-discrimination law: *Telescope Media Group v. Lucero* and *303 Creative LLC v. Elenis*.

In *Telescope Media Group*, the Eighth Circuit considered whether a state public accommodations anti-discrimination law could be enforced to require owners of a media group to produce "both opposite-sex and same-sex-wedding videos, or none at all."  936 F.3d at 748.  The State of Minnesota interpreted its public accommodations law to require that "[i]f the [owners] enter the wedding-video business, their videos must depict same- and opposite-sex weddings in an equally 'positive' light," and that if they did not do so, they "will have unlawfully discriminated against prospective customers 'because of' their sexual orientation."  *Id.* at 748-49.  The owners of the media group sued under the First Amendment on the "theory . . . that it is unconstitutional under the Free Speech Clause of the First Amendment to require them to make same-sex wedding videos."  *Id.* at 749.

The Eighth Circuit held that the First Amendment applied to the wedding videos, finding that the wedding videos "are a form of speech."  *Id.* at 750.  The court of appeals reasoned:

---

[26] None of the cases the parties cite and discuss that have specifically addressed a similar free-speech challenge to other state or local laws banning conversion therapy—*Chiles*, *Otto*, or *Tingley*—also considered a free-speech challenge to a public accommodation anti-discrimination law as applied to counselors in this context.  Similarly, to the extent the parties continue to discuss *NIFLA* and *Casey*, among others, those cases are somewhat less helpful or instructive because neither involved a free-speech challenge to a public accommodations anti-discrimination law.  For that reason, the Court focuses its analysis looking to First Amendment cases where the Eighth Circuit or the Supreme Court *did* consider a First Amendment free-speech challenge involving an otherwise neutral and generally applicable state or local public accommodations anti-discrimination law.

36

Although the Larsens do not plan to make feature films, *the videos they do wish to produce will convey a message designed to affect public attitudes and behavior.* According to their complaint, they will tell healthy stories of sacrificial love and commitment between a man and a woman, depict marriage as a divinely ordained covenant, and oppose the current cultural narratives about marriage with which the Larsens disagree. *By design, [the videos] will serve as a medium for the communication of ideas about marriage.* And like the creators of other types of films, such as full-length documentaries, the Larsens will exercise substantial editorial control and judgment, including making decisions about the footage and dialogue to include, the order in which to present content, and whether to set parts of the film to music. *The videos themselves are, in a word, speech.*

*Id.* at 751 (internal quotation marks and citations omitted) (emphasis added).

Four years after the Eighth Circuit decided *Telescope Media Group*, the Supreme Court applied a similar analysis in *303 Creative*. In *303 Creative*, the plaintiff brought a First Amendment free-speech challenge to the application of a public accommodations anti-discrimination law relating to the creation of wedding websites. In that case, the Supreme Court found that the creation of a wedding website qualifies as pure speech in that the websites "promise to contain images, words, symbols, and other modes of expression"; that "every website will be [the creator-plaintiff's] original, customized creation"; and that the websites will be created "to communicate ideas—namely, to celebrate and promote the couple's wedding and unique love story and to celebrate and promote what [the creator-plaintiff] understands to be a true marriage." *303 Creative*, 600 U.S. at 587 (cleaned up). Also similar to *Telescope Media Group*, the Supreme Court found that the wedding websites were the creator-plaintiff's own speech, in that the creator-plaintiff "intends to vet each prospective project to determine whether it is one she is willing to endorse," "will consult with clients to discuss their unique stories as source material," and "will produce a final story for each couple using [the creator-plaintiff's] own words and her own original artwork." *Id.* (cleaned up). Accordingly, the Supreme Court held that applying the state public accommodations anti-discrimination law to require the creation of same-sex wedding websites violated the First Amendment. *Id.* at 603.

In addition to *Telescope Media Group* and *303 Creative*, the Court finds *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), instructive as well. In *Hurley*, the Supreme Court earlier considered a First Amendment free-speech challenge also in the particular context of the application of a state public accommodations anti-discrimination law. There, a state court had found that a private sponsor of an annual St. Patrick's Day parade could not—under the applicable public accommodations anti-discrimination law—reject an application

37

by an organization of gay, lesbian, and bisexual descendants of Irish immigrants to march in the parade. *Id.* at 562. The state court rejected the parade sponsor's argument that applying the public accommodations anti-discrimination law in this way violated their First Amendment rights. *Id.* On appeal, however, the Supreme Court found that the parade sponsor's First Amendment rights were violated to the extent the public accommodations anti-discrimination law did not permit them to reject the organization's application to march in the parade.

The Supreme Court recognized that both the parade itself and the organization's participation as a unit in the parade were each expressive in nature or in character such that the First Amendment applied. *Id.* at 569-70. As a result, the Supreme Court held that applying the public accommodations law to the parade sponsor as the state court had done was inconsistent with the First Amendment:

> [O]nce the expressive character of both the parade and the marching [organization] contingent is understood, it becomes apparent that the state courts' application of the [public accommodations anti-discrimination] statute had the effect of declaring the sponsors' speech [i.e., the parade as a whole consisting of certain groups of marchers approved by the organizer] itself to be the public accommodation. Under this approach any contingent of protected individuals with a message would have the right to participate in petitioner's speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own. But this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.

*Id.* at 573. In doing so, the Supreme Court in *Hurley* distinguished the parade from an earlier case involving a First Amendment free-speech challenge to requirements that cable operators set aside channels for designated broadcast signals,[27] and likened the parade to a newspaper[28] and a private utility's bill and newsletter,[29] noting the First Amendment principle that "when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised." *Id.* at 575-76.

Here, Counselor Plaintiffs argue that the First Amendment is implicated to the extent the Public Accommodation Ordinance requires that they provide certain counseling to clients because

---

[27] *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622 (1994) (finding no free-speech violation).

[28] *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) (finding free-speech violation).

[29] *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of California*, 475 U.S. 1 (1986) (finding free-speech violation).

"speech is the therapy." In other words, the counseling or the counseling conversations they have is "pure speech" that is protected by the First Amendment. Rather than asking whether *speech is the therapy*, though, the more appropriate question for purposes of Counselor Plaintiffs' First Amendment free-speech challenge to the Public Accommodation Ordinance as applied to their counseling is whether *counseling is speech*. (*See also* Doc. 10 at 24 (asserting that "Counselors have a First Amendment right to counsel consistent with their beliefs").)

While speech may not be deemed conduct just because the government says it is, this First Amendment principle presupposes that what is being regulated is "protected expression" as "distinct from . . . nonexpressive conduct." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) (recognizing that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech"). Counseling lacks the same ultimate communicative or expressive character that was dispositive in the cases discussed above. Counselor Plaintiffs' argument that because counseling—whether as a noun or a verb—relies on verbal communication and necessarily occurs through conversations between a counselor and a client and therefore it must be considered "speech" under the First Amendment, misses the mark.

*Hurley* establishes that the application of a public accommodations anti-discrimination law may violate the First Amendment when it forces a speaker—i.e., one engaged in protected speech—to communicate an idea or a message that is inconsistent with their own. In both *303 Creative* and *Telescope Media Group*, the First Amendment was held to apply because the wedding websites and wedding videos were—like the parade in *Hurley*—found to themselves be communicative or expressive in that they were intended and designed to convey a message and to communicate ideas. It was not determinative in either *303 Creative* or *Telescope Media Group* that the wedding websites or wedding videos contained or reproduced verbal communication, words, or language itself. Rather, the guiding framework applying the appropriate First Amendment analysis was whether the wedding websites or the wedding videos *were themselves* speech protected by the First Amendment. So it must be here.

That counseling involves speech or verbal communication as the mode, method, or medium, does not solely resolve the constitutional issue Counselor Plaintiffs raise. Although it is not dispositive, the Court recognizes that Missouri law defines counseling as the employment or usage of "techniques, methods, or procedures based on principles for assessing, understanding, or including behavior." § 337.500(7)(a), RSMo. Counselor Plaintiffs allege in the verified complaint

39

that in counseling a client they rely on their "professional training and expertise," in combination with other factors and inputs such as their own religious beliefs, and that in a counseling session they "listen[], talk[] with their clients, lead[] them in exercises, and ask[] probing questions to *aid the client's self-discovery*." (Doc. 1 at ¶¶ 44, 66 (emphasis added).) If it can be said to be anything, the product of counseling or talk therapy as a practice, as alleged in the complaint, is a client's self-discovery and progress towards mental or emotional goals guided by a professional counselor. (*See* Doc. 9-2 at 4, ¶ 26 (suggesting that the goal of counseling or talk therapy is that the client "move[s] through self-discovery and work[s] towards the goals they set for themselves").)

The First Amendment protects "the freedom of speech both as an end and as a means[;] . . . [a]n end because the freedom to think and speak is among our inalienable human rights[,] . . . [and a] means because the freedom of thought and speech is indispensable to the discovery and spread of political truth." *303 Creative*, 600 U.S. 570, 584 (2023) (internal quotation marks omitted). The First Amendment does not protect non-expressive conduct. Counseling—that is, when a professional counselor engages in a conversation with a client using and relying on specific recognized and established techniques, methods, and procedures based on established principles for assessing or understanding behavior to guide a client through a process of self-discovery to work towards mental or emotional or relational goals the client sets for herself—is non-expressive conduct that is not protected under the First Amendment.

"[A]pplications of antidiscrimination laws that actually *do* target conduct . . . are generally constitutional even when they incidentally affect speech." *Telescope Media Grp.*, 936 F.3d at 757 (citing *Hurley*, 515 U.S. at 572-73. "An employment-discrimination law, for example, can unquestionably 'require an employer to take down a sign reading 'White Applicants Only.'" *Id.* (quoting *FAIR*, 547 U.S. 47, 62 (2006)). While an individual's religious and philosophical views are protected, "it is a general rule that such [views] do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop v. Colo. Civ. Rights Comm'n*, 584 U.S. 631 (2018). Because counseling is not a "form of expression" having itself any inherent expressive nature or character, the Court finds that the Public Accommodation Ordinance as applied to Counselor Plaintiffs regarding the counseling services they provide to clients likely does not violate their First Amendment rights. Instead, the Public

Accommodation Ordinance as applied here regulates only Counselor Plaintiffs' non-expressive conduct as professional counselors, not any constitutionally protected speech.

## ii. Is the required use of preferred pronouns "pure speech"

In addition to their "counseling speech" though, Counselor Plaintiffs also assert an as-applied free-speech challenge to the Public Accommodation Ordinance to the extent it requires that they use pronouns for clients or potential clients that are inconsistent with the client or potential client's sex. As Counselor Plaintiffs point out in their reply, Defendants do not substantively address this specific claim or theory in their briefing. As to this claim only, the Court is persuaded that Counselor Plaintiffs have shown a likely violation of their First Amendment rights to the extent the Public Accommodation Ordinance plausibly (and at this juncture as not otherwise contested by the City) requires that they use pronouns otherwise inconsistent with an individual's sex.

To be sure, Counselor Plaintiffs' free-speech argument regarding the application of public accommodations anti-discrimination laws to the usage of pronouns appears to be a relatively untested and novel First Amendment theory. For example, although Counselor Plaintiffs point to a plethora of state laws and other administrative guidance that they contend "compel[s] businesses to use customers' preferred pronouns and titles," (*see* Doc. 1 at 41, ¶¶ 260-61), Counselor Plaintiffs only point to very limited caselaw in support of their First Amendment claim.[30]

In *Beard v. Falkenrath*, 97 F.4th 1109 (8th Cir. 2024), cited by Counselor Plaintiffs, the Eighth Circuit suggested that the use of gender pronouns is subject to ordinary First Amendment free-speech principles. *See id.* at 1117 (finding that the refusal to use a plaintiff's preferred pronouns is akin to making insulting or derogatory comments to the plaintiff, which of course does not give rise to a First Amendment claim "in part because the speaker has a right to make them").

In addition to *Beard*, Counselor Plaintiffs rely on a Sixth Circuit case, *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), in which the court of appeals held that the discipline of a university professor under the university's anti-discrimination policy for the professor's refusal (based on the professor's own religious beliefs) to use a student's preferred pronoun that did not align with the student's sex violated the First Amendment. After concluding that professors enjoy

---

[30] The Court's own legal research similarly revealed only a limited and yet-developing body of caselaw concerning First Amendment rights and pronoun usage, most of which involved the specific and somewhat nuanced area of school-based speech (by either students or teachers).

41

full free-speech rights including inside the classroom, the Sixth Circuit found that the use of gender-identity-based pronouns is speech, that is, such that the "mode of address [*is*] the message." *Id.* at 508. As the Sixth Circuit put it: "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.*; *see also Taking Offense v. State*, 66 Cal. App. 5th 696, 711 (Cal. Ct. App. 2021) (recognizing that "[f]or purposes of the First Amendment, there is no difference between a law compelling an employee to utter a [person's] preferred pronoun and prohibiting an employee from uttering a pronoun the [person] does not prefer," and holding that a state law prohibiting use of a pronoun other than a long-term healthcare resident's preferred pronoun violated staff members' free-speech rights as a content-based restriction on speech).

As set out above, the City's Public Accommodation Ordinance prohibits discrimination in places of public accommodation based on a person's sexual orientation or gender identity. The government violates the First Amendment when it compels or restricts "the fact of communication." *Cohen v. California*, 403 U.S. 15, 18 (1971). And as the Supreme Court emphasized in *NIFLA*, "[s]peech is not unprotected merely because it is uttered by 'professionals.'" 585 U.S. at 767; *see Telescope Media Grp.*, 936 F.3d at 752 (noting that it made no "difference that the [media group owners] are expressing their views through a for-profit enterprise"). Moreover, the First Amendment protects both the right to speak and the right to refrain from speaking. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind." (internal quotation marks omitted)); *Hurley*, 515 U.S. at 573 ("Since *all* speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." (internal quotation marks omitted).) The First Amendment "prevents the government from compelling individuals to mouth support for views they find objectionable." *Telescope Media Grp.*, 936 F.3d at 750 (cleaned up). To the extent the Public Accommodation Ordinance requires that Counselor Plaintiffs use preferred pronouns of clients or prospective clients that do not align with the client's sex—usage of which Counselor Plaintiffs object and where Counselor Plaintiffs seek to only use pronouns that are consistent with a client or potential client's sex—the Court concludes that it is likely that the First Amendment accordingly applies.

"But just because speech is protected does not mean that it must go unregulated." *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019). The next question as relevant to Counselor Plaintiffs'

as-applied challenge is to determine what level of scrutiny should apply to what the Public Accommodation Ordinance likely requires Plaintiffs to do. *See Miller v. Ziegler*, 109 F.4th 1045, 1050 (8th Cir. 2024). Counselor Plaintiffs assert that strict scrutiny—the highest bar—should apply because the Public Accommodation Ordinance in this manner discriminates based on viewpoint and is content-based. (Doc. 10 at 24-25.) *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) ("[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech . . . [and] [w]e therefore consider [the law] as a content-based regulation of speech"); *Telescope Media Grp.*, 936 F.3d at 754 (recognizing that "[l]aws that compel speech or regulate it based on its content are subject to strict scrutiny"). The City does not attempt to demonstrate that the application of the Public Accommodation Ordinance to Counselor Plaintiffs to require the use of a client or potential client's preferred pronouns when they are inconsistent with their sex "is narrowly tailored to serve a compelling state interest." *Telescope Media Grp.*, 936 F.3d at 754 (recognizing, as well, that "[i]n an as-applied challenge like this one, the focus of the strict-scrutiny test is on the actual speech being regulated, rather than how the law might affect others who are not before the court" (citing *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017))).

For purposes of Counselor Plaintiffs' motion for preliminary injunction and at this juncture, the Court finds that Counselor Plaintiffs have demonstrated a sufficient likelihood of success on the merits of their claim that the Public Accommodation Ordinance, as applied, violates their First Amendment free-speech rights to the extent it requires that they use a client or potential client's preferred pronouns, even when the preferred pronouns are inconsistent with the client or potential client's sex, or prohibits them from only using pronouns that are consistent with a client or potential client's sex. *See 303 Creative*, 600 U.S. at 592 and 595 n.3 (recognizing that "public accommodations statutes can sweep too broadly when deployed to compel speech," and that while the First Amendment "does *not* protect status-based discrimination unrelated to expression, generally it *does* protect a speaker's right to control her own message—even when we may disapprove of the speaker's motive or the message itself"); *Hurley*, 515 U.S. at 573 (the First Amendment does not permit application of a public accommodations law in a manner that "violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message"). Because the Court finds that Counselor Plaintiffs are likely to prevail on the merits of this First Amendment claim, they are deemed to

43

have satisfied the other *Dataphase* preliminary-injunction factors. *See Linn Mar Com. Sch. Dist.*, 83 F.4th at 668. Counselor Plaintiffs are entitled to preliminary injunctive relief accordingly.

### iii. Publication Clause

Finally, Counselor Plaintiffs assert a claim that the Public Accommodation Ordinance's Publication Clause restricts their speech because it "prohibits speech about activities that violate the [Public Accommodation Ordinance]." (Doc. 10 at 23.) In other words, Counselor Plaintiffs assert that to the extent the Public Accommodation Ordinance "requires the Counselors to provide counseling promoting views on sexuality and identity," the Publication Clause prohibits the Counselors from referring the requests for those views to others or publicizing their inability to provide that counseling." (*Id.*) In short, the Publication Clause "ban[s] the Counselors' speech about their constitutionally protected activities." (*Id.* at 24.) In response, the City asserts only that the Publication Clause does not "state that they cannot promote or publish their own, individual religious views," but that they are only prohibited from "excluding clients based on their gender identities or sexual orientations." (Doc. 20 at 35.)

The Court analyzes this claim through the lens of its findings above: that Counselor Plaintiffs are not entitled to preliminary injunctive relief as to their First Amendment claim that the Public Accommodation Ordinance unconstitutionally compels or restricts speech in the counseling that they provide but that they are entitled to preliminary injunctive relief as to their First Amendment claim that the Public Accommodation Ordinance likely unconstitutionally compels speech to the extent it requires that they use pronouns that are inconsistent with the client or preferred client's sex. It follows that to the extent Counselor Plaintiffs likely engage in constitutionally protected speech in only using pronouns that are consistent with a client or potential client's sex—and declining to use pronouns that are inconsistent with a client or potential client's sex—that the Publication Clause would likely violate their freedom of speech as applied to require preferred pronoun usage. The City makes no argument to the contrary.

### 4. Conclusion

As set out above, the Court finds that Counselor Plaintiffs are entitled to preliminary injunctive relief only as to (1) their First Amendment as-applied free-speech claim that the Public Accommodation Ordinance likely violates their constitutional rights by requiring the use of pronouns inconsistent with an individual's sex, and (2) the accompanying free-speech challenge to the Public Accommodation Ordinance's Publication Clause. Otherwise, Counselor Plaintiffs

44

are not entitled to preliminary injunctive relief whether because they have not satisfied their burden as a movant or because, as explained below, the Counseling Ordinance and the Public Accommodation Ordinance (as applied to professional counseling activities) do not violate the First Amendment.

## C. Vagueness and Overbreadth Challenges under the Fourteenth Amendment

Counselor Plaintiffs also seek preliminary injunctive relief to the extent the Counseling Ordinances are vague as applied to Counselor Plaintiffs and to the extent the Public Accommodation Ordinance's Unwelcome Clause is facially overbroad.

### 1. Are the Counseling Ordinances Unconstitutionally Vague?

Counselor Plaintiffs argue that the Counseling Ordinances are unconstitutionally vague as applied to them because the ordinances do not adequately or fairly define the terms "conversion therapy," "change," "gender identity," or "sexual orientation" so that Counselor Plaintiffs can know when their counseling on such issues implicates the challenged ordinances.

The "void-for-vagueness doctrine" under the Fourteenth Amendment requires that a statute define an offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited," and that it does so "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (collecting cases); *see Nygard v. City of Orono*, 39 F.4th 514, 519 (8th Cir. 2022) (recognizing that a "vagueness challenge" requires a "two-part test:  The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement.") (internal quotation marks omitted).  "An as-applied challenge fails if the person challenging the provision has received fair warning of the [unlawfulness] of his own conduct." *Id.* (internal quotation marks omitted).  Where an ordinance adequately defines a term to appropriately give notice of the ordinance's application as applied to the plaintiff's conduct, the ordinance is not unconstitutionally vague.  *See id.* at 519-20.  A law is void-for-vagueness "if it forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Stephenson v. Davenport Community Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (internal quotation marks omitted).

In an as-applied vagueness challenge, a plaintiff must show that the challenged ordinances are unconstitutionally vague *as applied* to his own particular conduct.  *See United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016); *see also Holder*, 561 U.S. at 18-19 ("a plaintiff who engages in

some conduct that is clearly proscribed cannot complain about the vagueness of the law as applied to the conduct of others") (cleaned up). "[P]erfect clarity and precise guidance ha[s] never been required even of regulations that restrict expressive activity." *Holder*, 561 U.S. at 19.

The Counseling Ordinances make it "unlawful for any provider to provide conversion therapy or reparative therapy to a minor." K.C. Ord. § 50-234(c); *see* Jackson Cnty. Ord. § 5575.2. In turn, the Counseling Ordinances define "conversion therapy or reparative therapy" as "any practice or treatment that seeks to change an individual's sexual orientation or gender identity." K.C. Ord. § 50-234(b)(1); *see* Jackson Cnty. Ord. § 5575.1(a). The ordinances set out that conversion therapy or reparative therapy specifically *includes* "efforts to change behaviors or gender expressions or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender," and specifically does *not include*:

> counseling that provides support and assistance to a person undergoing gender transition, or counseling that provides acceptance, support and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral treatment interventions to prevent or address unlawful conduct or unsafe sexual practices, *as long as such counseling does not seek to change sexual orientation or gender identity*."

*Id.* (emphasis added).

The ordinances define (1) "gender identity" as "the gender-related identity, appearance, expression, behavior or mannerisms or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth," K.C. Ord. § 50-234(b)(2); *see* Jackson Cnty. Ord. § 5575.1(b), and (2) "sexual orientation" as "the preference or practice of homosexuality, heterosexuality, asexuality, and bisexuality, or some combination thereof, by consenting adults, or as perceived by others, but not including sexual preference or practice between an adult and a minor," K.C. Ord. § 50-234(b)(5); *see also* Jackson Cnty. Ord. § 5575.1(e) (defining sexual orientation as "a person's enduring physical, romantic, and/or emotional attraction to another person," which "can include heterosexual (straight), lesbian, gay, bisexual, queer, asexual, and other orientations").

In the verified complaint, Counselor Plaintiffs (as cited in the preliminary injunction motion) state that they have referred requests for counseling to other counselors or otherwise declined to ask questions on the topics of gender identity and sexual orientation in the context of requests by parents "to provide counseling for their minor children to address and change, reduce, and eliminate their same-sex attractions or gender identity" as inconsistent with their sex. (Doc. 1

46

at 32 ¶ 197-99 (counseling as to an eleven-year-old girl who identified as a boy and wanted to use a boy's name); *id.* at 33, ¶¶ 201-205 (counseling of a twelve-year-old girl who was "struggling with gender identity" and suffering from "gender dysphoria"[31]); *id.* at ¶ 207 (limited phone conversation with potential client for "minor child who struggled with gender identity"); *id.* at 34, ¶ 208-209 (regularly declining to counsel minors for "request from parents asking [Ms. Eisenreich] to provide counseling for their minor children to address and change, reduce, and eliminate their same-sex attractions or gender identity"); *id.* at 35, ¶¶ 217-22 (Mr. Bury referring prospective minor client to another counselor where parents sought counseling after the minor had "engag[ed] in inappropriate sexual behavior" at school and the parent "questioned whether the child was experiencing same-sex attractions or confusion about his gender identity" and asked whether Mr. Bury "would be able to change, reduce, or eliminate these issues with the child"); *id.* at ¶¶ 223-24 (referring potential minor client "whose mother sought help for her child who was struggling with feeling like a different sex from the child's biological sex"); *id.* at ¶ 225-27 (referring counseling request for minor children by parents who "asked whether Bury would help their child change, reduce, or eliminate [inappropriate sexual behaviors] and [same-sex] attractions").)

As the verified complaint makes clear, the as-applied vagueness challenge is no more than an attempted repackaging of their First Amendment free-speech claim challenging the Counseling Ordinances. While Counselor Plaintiffs may believe that the Counseling Ordinances violate their asserted free-speech rights, the verified complaint demonstrates that the Counseling Ordinances provide sufficient clarity as to what is prohibited—counseling intended *to change* a minor's sexual orientation or gender identity. *See Telescope Media Grp.*, 936 F.3d at 762 (rejecting argument that public accommodations law as-applied to wedding video company was unconstitutionally vague where the complaint clearly identifies what they believe the law prohibits, such that "their argument that they are somehow left in legal limbo rings hollow"); *cf. Linn Mar Com. Sch. Dist.*, 83 F.4th at 667-68 (finding that plaintiffs were likely to succeed on their vagueness challenge to a school policy that prohibited "an intentional and/or persistent refusal . . . to respect a student's gender identity" because the policy did not define or limit the term "respect" and therefore "it

---

[31] Gender dysphoria is a diagnosis recognized by the American Psychiatric Association as "a feeling of distress . . . when a person's gender identity differs from the sex assigned at birth." *See Gender Dysphoria*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gender-dysphoria/symptoms-causes/syc-20475255.

could cover any speech about gender identity that a school administrator deems 'disrespectful' of another student's gender identity").  Considering the text and definitions contained within the Counseling Ordinances as well as Counselor Plaintiffs' verified complaint, the Court is not persuaded that Counselor Plaintiffs have demonstrated even a fair chance of success on the merits of their claim that the Counseling Ordinances fail to give fair notice of what conduct is proscribed or that they risk arbitrary enforcement.[32]

### 2.    Is the Unwelcome Clause Unconstitutionally Overbroad?

In addition, Counselor Plaintiffs seek a preliminary injunction as to their claim that the Unwelcome Clause within the Public Accommodation Ordinance is unconstitutionally overbroad. Specifically, Counselor Plaintiffs assert that the Unwelcome Clause—which prohibits "any written or printed communication, notice or advertisement to the effect that . . . the patronage or custom of any person . . . is unwelcome or objectionable or not acceptable to such place," K.C. Ord. § 38-113(a)—is "overbroad insofar as it regulates speech."  (Doc. 10 at 31.)

Under the First Amendment, a law is "facially invalid if it prohibits a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292 (2008).  The overbreadth doctrine weighs the risk that an overbroad law will "inhibit the free exchange of ideas" by "deter[ring] people from engaging in constitutionally protected speech," with "invalidating a law that in some of its applications is perfectly constitutional . . ."  *Id.*  Thus, to be facially invalid, "a [law]'s overbreadth [must] be *substantial*, not only in an absolute sense, but also relative to the [law]'s plainly legitimate sweep."  *Id.*

Counselor Plaintiffs suggest that the terms "unwelcome," "objectionable," or "not acceptable" "must mean something different than refusing, withholding, or denying a service," which the ordinance otherwise prohibits, and properly understood is then an overbroad regulation of speech.  (Doc. 10 at 31.)  This argument is belied by the plain language of the statute.  In full, the Public Accommodation Ordinance, K.C. Ord. § 38-113(a), provides:

> It shall be a discriminatory accommodation practice for any owner, agent or employee of any place of public accommodation, directly or indirectly, to refuse, withhold from or deny to any person any of the accommodations mentioned in this

---

[32] Other than asserting in a conclusory manner that the terms or language used in the ordinances are "broad" and vague, Counselor Plaintiffs rely wholly on the verified complaint—which as the Court notes above, indicates that Counselor Plaintiffs have fair notice of—and in fact understand—what is proscribed by the Counseling Ordinances.  Counselor Plaintiffs do not cite relevant caselaw or provide any meaningful substantive legal analysis other than citing *Kolendar* for the general vagueness standard.

chapter or to discriminate against any person in the furnishing thereof on account of race, religion, color, ancestry, national origin, sex, marital status, familial status, disability, sexual orientation or gender identity of such person, or directly or indirectly to publish, circulate or display any written or printed communication, notice or advertisement to the effect that any of the accommodations or the facilities of such place of public accommodation will be refused, withheld from or denied to any person on account of race, religion, color, ancestry, national origin, sex, disability, marital status, familial status, sexual orientation or gender identity, or that, for such reasons, the patronage or custom of any person described in this section is unwelcome or objectionable or not acceptable to such place.

The Public Accommodation Ordinance makes it an unlawful discriminatory practice for a place of public accommodation to publish, circulate, or display a written or printed communication, notice, or advertisement that the patronage or custom of a person is unwelcome, objectionable, or not acceptable to the place of public accommodation *because of* such person's protected characteristic(s). In other words, the terms unwelcome, objectionable, or not acceptable are "*qualifiers*" describing what the Public Accommodation Ordinance as a whole prohibits: "messages of limited access to the goods and services of a public accommodation because of a patron's protected status." *Fort Des Moines Church of Christ v. Jackson*, 215 F. Supp. 3d 776, 795 (S.D. Iowa 2016). These qualifiers are different than a communication, notice, or advertisement that the goods and services of the public accommodation will be withheld or denied to a person because of the person's protected characteristic, which is also prohibited. Even if the clauses did conflict, the more specific would prevail over the more general. *See State ex rel. Taylor v. Russell*, 449 S.W.3d 380, 382 (Mo. banc 2014).

Either way Counselor Plaintiffs ultimately fail "to identify [any] unconstitutionally broad applications of the instant provision[], let alone demonstrate that a substantial number of such applications exist." *Jackson*, 215 F. Supp. 3d at 797. Instead, it appears likely that "[e]ven assuming the Unwelcome [Clause], when read alone, unconstitutionally restricts speech, the [Publication] Clause, when read as a whole, is primarily focused on access to goods and services," and in this way, "'whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.'" *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1189 (10th Cir. 2021) (quoting *Broadrick*, 413 U.S. at 615-16), *rev'd on other grounds*, 600 U.S. 570 (2023).[33] In short, Counselor Plaintiffs have not demonstrated even a fair chance of success on the merits of their overbreadth challenge, either.

---

[33] The Supreme Court granted *certiorari* in *303 Creative* only on the issue of whether application

49

## IV. Defendants' Motion to Dismiss

As best as the Court can discern, Defendants seek dismissal of some of Counselor Plaintiffs' constitutional claims, as addressed below.

### A. Free-Speech Claims

#### 1. Counseling Ordinances (Count 1)

As noted above, the Court agrees with Defendants that the Counseling Ordinances are not subject to the high bar of strict scrutiny because they regulate Counselor Plaintiffs' professional conduct and only incidentally burden their speech in doing so. As best as the Court can discern, Defendants argue that Counselor Plaintiffs' First Amendment challenge to the Counseling Ordinances must be dismissed because they survive rational basis review. In this regard, the Court notes that it is not aware—and Defendants do not cite—any Eighth Circuit case that has specifically considered what level of scrutiny (whether intermediate scrutiny or rational basis review) should apply to consider the constitutionality of a law that otherwise regulates professional conduct in the same vein as recognized by the Supreme Court in *Casey*. In *NIFLA*, the Supreme Court noted only that to the extent the professional-conduct exception applies, the speech involved is simply "afforded less protection" than pure speech (i.e., for which strict scrutiny would otherwise apply). 585 U.S. at 768.

Under rational basis review, the ordinances are presumed to be constitutional and Counselor Plaintiffs (as the challengers) must show that the ordinances are "not rationally related to any legitimate government purpose." *Richenberg v. Perry*, 97 F.3d 256, 261 (8th Cir. 1996). Alternatively, to the extent that intermediate scrutiny applies, the burden is on Defendants to show that the Counseling Ordinances (1) "advance[] important governmental interest unrelated to the suppression of free speech," and (2) "do[] not burden substantially more speech than necessary to further those interests." *Cornelio v. Connecticut*, 32 F.4th 160, 171 (2d Cir. 2022) (internal quotation marks omitted).

What level of scrutiny should apply here is uncertain. *See 360 Virtual Drone Serv. LLC v. Ritter*, 102 F.4th 263, 275-76 (4th Cir. 2024) (recognizing a disagreement among federal courts

---

of the state public accommodations anti-discrimination statute to compel plaintiffs to create custom websites celebrating same-sex weddings violated the First Amendment. *303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (2022) (granting *certiorari* for the question: "Whether applying a public-accommodation law to compel an artist to speak or stay silent violates the Free Speech Clause of the First Amendment"); *see 303 Creative LLC v. Elenis*, 725 F. Supp. 3d 1235, 1240 (D. Colo. 2024) (on remand).

50

applying either intermediate scrutiny—or in the case of the Fourth Circuit, a modified intermediate-scrutiny standard—or rational basis review to analyze the constitutionality of regulations of professional conduct that incidentally burden speech). One district court in the Eighth Circuit has, under similar circumstances, applied intermediate scrutiny rather than rational basis review. *Am. Med. Assoc. v. Stenehjem*, 412 F. Supp. 3d 1134, 1148-49 (D.N.D. 2019) (applying *Capital Associated Indus. v. Stein*, 922 F.3d 198, 209 (4th Cir. 2019); other citation omitted). The Court is somewhat persuaded by the Fourth Circuit's reasoning in *Stein* that applying an intermediate level of scrutiny to conduct-regulating laws that incidentally impact speech "strikes the appropriate balance between the states' police powers and individual rights." 922 F.3d at 209.

In *Casey*, the Supreme Court held that the informed-consent requirement was constitutional, even in light of the physician's recognized First Amendment rights "not to speak," because the law regulated the practice of medicine which is "subject to reasonable licensing and regulation by the State." 505 U.S. at 884. In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the Supreme Court held that "[a] law regulating abortion [i.e., a law regulating the practice of medicine], like other health and welfare laws, is entitled to a strong presumption of validity," and "must be sustained if there is a rational basis on which the legislature could have thought that it would serve legitimate state interests." *Id.* at 301 (internal quotation marks omitted). As a general rule within First Amendment jurisprudence, intermediate scrutiny is applied to "content-neutral laws [that regulate speech] . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *TikTok, Inc. v. Garland*, 604 U.S. __, 145 S. Ct. 57, 67 (2025) (internal quotation marks omitted). Counselor Plaintiffs maintain that the Counseling Ordinances are content-based and that they discriminate based on viewpoint. However, consistent with the Supreme Court's analysis in *Casey*, when the government enacts a law as part of its police powers that regulates professional conduct (or even that regulates speech as professional conduct), all that is required is that the law is reasonable; that is, that it satisfies a rational basis review. Indeed, when a law falls into the *Casey* professional-conduct category, it is because it does not regulate speech as speech at all, but rather it regulates professional conduct and in doing so incidentally burdens speech. *See Pickup v. Brown*, 740 F.3d 1208, 1231 (9th Cir. 2014). Ultimately, the Court is persuaded that the rational basis standard of review applies to Counselor Plaintiffs' free-speech challenge to the Counseling Ordinances.

51

As Defendants assert, local governments have a substantial interest in protecting the health and welfare of minors. *Sable Commc'ns of Cal., Inc. v. FCC*, 429 U.S. 115, 126 (1989); *New York v. Ferber*, 458 U.S. 747, 757 (1982). Under a rational basis standard of review, "all that must be shown is any reasonably conceivable state of facts that could provide a rational basis for the [law]," which need not be supported by any evidence or empirical data. *Gilmore v. County of Douglas*, 406 F.3d 935, 937 (8th Cir. 2005) (internal quotation marks omitted). Counselor Plaintiffs make no argument that the Counseling Ordinances are not rationally related to the asserted interest in protecting the health and welfare of minors and particularly LGBTQ+ youth from serious harms and risks the governments have identified from the practices of conversion therapy. Under rational basis review, so long as the Court can identify any "conceivable basis for the government action at issue," the law will withstand constitutional scrutiny. *Id.* at 940.

Because they do not address Defendants' argument that the Counseling Ordinances survive rational basis review, Counselor Plaintiffs have waived any argument to the contrary. Nonetheless, the Court notes that as Counselor Plaintiffs acknowledge, "[t]here is an ongoing debate within the medical field and society about how to best treat children who identify as a gender contrary to their sex or [who] experience gender dysphoria (an incongruence between their gender and sex"). (Doc. 1 at 17, ¶ 98.) In enacting the Counseling Ordinances, the City and County legislatures considered a body of research by professionals in education, social work, health, mental health and counseling, including the American Academy of Child and Adolescent Psychiatry, finding that (1) conversion therapy is not effective, and (2) conversion therapy is dangerous and has been shown to contribute to depression, self-harm, low self-esteem, family rejection, and suicide. (Doc. 1-1 at 2; Doc. 1-2 at 2-3.) It is conceivable that the mental or emotional health or wellbeing of a minor struggling with self-identity issues or their sexuality may well be negatively impacted—including their sense of self-image, belonging or other feelings or beliefs of stigmatization, for example—when they receive counseling that is intended to affirmatively change their existing identity or belief as related to their sexual orientation or gender identity.[34]

---

[34] The Court acknowledges that Counselor Plaintiffs state that they only provide counseling for minors with the minors' consent and only so long as the minor voluntarily participates in counseling. At the same time, as many of Counselor Plaintiffs' allegations illustrate, also at play in these situations is the difficult and complex nature of parental-child relationships. There are many things for which minors cannot legally consent to under the law. To the extent a minor's decision to voluntarily participate in counseling— whether conversion therapy or otherwise—is easily influenced by a variety of societal, cultural, religious, and familial influences, it may well be difficult to say or determine that a minor has fully and voluntarily

52

Ultimately—Counselor Plaintiffs' waiver of any argument to the contrary notwithstanding—the Court cannot say that Defendants acted irrationally by prohibiting the practice of conversion therapy of minors by professional and licensed counselors and others providing professional mental health services. The legislatures considered a body of research and evidence questioning the effectiveness and effects of such practices. It is conceivable that conversion therapy—defined as any counseling practice to change a minor's then-existing sexual orientation or gender identity—would exacerbate an already existing mental health struggle for a minor dealing with these issues in a way that would result in further mental, emotional, or physical harm to the child given the myriad of relational, familial, societal, etc., pressures to which the child is simultaneously subject to, and would therefore be contrary to the City and County's interest in protecting the health and wellbeing of minor children within their jurisdictions.[35] Accordingly, Count 1 is dismissed.

### 2.    Public Accommodation Ordinance (Count 2)

As set out above, the Court finds that the Public Accommodation Ordinance does not infringe Counselor Plaintiffs' First Amendment free-speech rights as applied to Counselor Plaintiffs' professional counseling. The Court does not otherwise construe Defendants' motion to dismiss as seeking dismissal of Counselor Plaintiffs' separate as-applied First Amendment free-speech claim challenging the Public Accommodation Ordinance (and as accompanied by the Publication-Clause claim) on the grounds that Counselor Plaintiffs are *required* to use a client or

_____

(in the truest sense) "consented" to conversion-therapy counseling in any particular circumstance.

[35] The Court emphasizes that rational basis review considers *only* whether the challenged law is rationally related to a legitimate government purpose or interest. The Court need not—and does not—consider the question of whether conversion therapy is in fact harmful for minors, and does not consider the validity, weight, or value of any of the scientific literature and studies on which Defendants relied in enacting the Counseling Ordinances or which Counselor Plaintiffs present themselves in this case to the extent they argue that it is the prohibition of conversion therapy that is actually harmful (or more harmful) to minors. "[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data," and "the law survives rational basis review so long as the legislative facts on which the law is apparently based could reasonably be conceived to be true by the governmental decisionmaker." *Gallagher v. City of Clayton*, 669 F.3d 1013, 1020 (8th Cir. 2012) (cleaned up). Indeed, the presence of an on-going debate within society and among experts in specialized fields such as medicine and adjacent or similar fields is precisely the context in which legislatures are permitted a zone of choice consistent with individual constitutional rights. *See United States v. Skrmetti*, 605 U.S. __, 2025 WL 1698785, at *13 (June 28, 2025) (applying rational basis review in a similar manner, recognizing the state legislature's decision in the context of "an ongoing debate among medical experts" on the topic matter subject to the challenged law). That is all the Court endeavors to do here—to apply rational basis review under well-established constitutional principles.

potential client's preferred pronoun that is inconsistent with the client or potential client's sex (or in other words, that it makes it an unlawful discriminatory practice to refuse to use a client's preferred pronoun when the pronoun is inconsistent with the client's sex). Count 2 is accordingly dismissed only as to Counselor Plaintiff's free-speech challenge to the Public Accommodation Ordinance vis-a-vis the counseling services they provide. Counselor Plaintiffs' free-speech challenge to the Public Accommodation Ordinance vis-à-vis their usage of pronouns is not dismissed at this juncture.

### B. Free-Exercise Claim (Count 3)

Defendants also argue that Counselor Plaintiffs' claim that the Counseling Ordinances violate the Free Exercise Clause of the First Amendment should be dismissed for failure to state a claim.[36] The Free Exercise Clause of the First Amendment "protects not only the right to harbor religious beliefs inwardly and secretly," but also "protect[s] the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)). A violation of the Free Exercise Clause occurs when a regulation or law that is not "neutral" and "generally applicable" burdens a plaintiff's "sincere religious practice.'" *Id.* at 525. Under these circumstances, strict scrutiny applies. *Id.*; *see Telescope Media Grp.*, 936 F.3d at 759 (recognizing that a "neutral, generally applicable law[] that incidentally burden[s] 'a particular religious practice' do[es] not have to be 'justified by a compelling governmental interest'") (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

Defendants argue that the Counseling Ordinances are neutral and generally applicable regulations and therefore subject only to rational basis review. *See Doe v. Parson*, 960 F.3d 1115, 1119 (8th Cir. 2020) (applying rational basis review). As Counselor Plaintiffs point out, however, Defendants do not discuss their free-exercise claim under the hybrid-rights doctrine recognized by the Eighth Circuit in *Telescope Media Group*, *see* 936 F.3d at 759-60; a claim for which strict

---

[36] Defendants' briefing does not substantively address Counselor Plaintiffs' claim in Count 4 that the Public Accommodation Ordinance also violates the Free Exercise Clause. Although the heading for the section of Defendants' briefing addressing Counselor Plaintiffs' claims under the Public Accommodation Ordinance suggests that the free-exercise claim should be dismissed, the briefing substantively only addresses whether the Public Accommodation Ordinance regulates Counselor Plaintiffs' speech or conduct and does not consider or apply the analysis that applies to a free-exercise claim. (*See* Doc. 20 at 31-35.)

scrutiny applies. Nevertheless, as explained above, the Court dismisses Counselor Plaintiffs' free-speech challenge to the Counseling Ordinances. Accordingly, the hybrid-rights doctrine does not support a plausible free-exercise claim against the Counseling Ordinances.

Ultimately, Counselor Plaintiffs argue that their free-exercise challenge to the Counseling Ordinances are subject to strict scrutiny (not rational basis review) because (1) the Jackson County Counseling Ordinance is not neutral to religion in that the sponsoring Jackson County legislator made comments referencing religious groups' ties to conversion therapy and to church-specific opposition to the conversion therapy ordinance, and (2) neither ordinance is generally applicable because each permits secular conduct contrary to the asserted governmental interests for the ordinances in the health and safety of minors.[37]

As to the neutrality element of the free-exercise challenge, Counselor Plaintiffs point to allegations in the verified complaint that the sponsoring Jackson County legislator made several statements when the county legislature was considering the Jackson County Counseling Ordinance, including that conversion therapy was typically practiced by "religious organizations," that the primary opposition to the proposed ordinance was from "the Baptist church," and that a religious exemption was not included in the ordinance because "the reality that the church can do whatever they want however they want is just not true." (Doc. 31 at 28-29 (quoting Doc. 1 at ¶¶ 149-53).)

Under a constitutional free-exercise analysis, a law may be found to not be neutral if there is "any indication that the [law] was designed to impose" a burden on anyone on the basis of religious belief. *New Doe Child #1 v. United States*, 901 F.3d 1015, 1025 (8th Cir. 2018). As the Supreme Court has held, the government has a "duty under the First Amendment not to base laws or regulations on hostility to a religion or a religious viewpoint." *Masterpiece Cakeshop*, 584 U.S. at 638. The Supreme Court has further recognized that the Free Exercise Clause may be violated even with a mere "subtle departure[] from neutrality on matters of religion." *Id.* at 639.

In *Masterpiece Cakeshop*, the Supreme Court found that Colorado Civil Rights Commission violated the Free Exercise Clause in its consideration and adjudication of a civil rights complaint against a bakery for its refusal to provide a wedding cake for a same-sex marriage (based on the owner's religious opposition to same-sex marriage). Specifically, the Supreme Court found

---

[37] Defendants do not address either of these arguments in their reply (or their argument that the free-exercise claim against Counselor Plaintiffs should be dismissed at all, for that matter).

that the "Commission's treatment of this case has some elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated [the owner's] objection." 584 U.S. at 635. In relevant part in making this finding, the Supreme Court relied on the public hearing record which reflected that throughout two public hearings, several commissioners "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community."[38] *Id.* at 634. The Supreme Court acknowledged that some of the statements "[s]tanding alone . . . are susceptible to different interpretations," but that when viewed in the totality of the circumstances, including that the record did not include any objection to these comments from other commissioners, the statements "cast doubt on the fairness and impartiality of the Commission's adjudication" of the civil rights complaint, *id.* at 635, and thus "was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion," *id.* at 640.

In *Masterpiece Cakeshop*, the Supreme Court acknowledged a "disagree[ment] on the question [of] whether statements made by lawmakers may properly be taken into account in determining whether a law intentionally discriminates on the basis of religion." *Id.* at 636 (citing *Hialeah*, 508 U.S. at 540-42, 558). The Court emphasized in that case, though, that the free-exercise challenge there occurred in a different context than in *Hialeah*, where the disagreement arose and which concerned a legislative body acting in a legislative capacity, *see* 508 U.S. at 540,[39]

---

[38] These statements included: "that [the owner] can believe 'what he wants to believe,' but cannot act on his religious beliefs 'if he decides to do business in the state'"; that "'[i]f a businessman wants to do business in the state and he's got an issue with the . . . law's impacting his personal belief system, he needs to look at being able to compromise"; and that "'[f]reedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the holocaust . . . [a]nd to me it is one of the most despicable pieces of rhetoric that people can use to . . . use their religion to hurt others." *Masterpiece Cakeshop*, 584 U.S. at 634-35.

[39] In *Hialeah*, Justice Kennedy's opinion—in the section joined only by Justice Stevens—noted that "[r]elevant evidence" to determine the legislative body's "object" in enacting the challenged law "includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." 508 U.S. at 540. In an opinion concurring in the judgment, Justice Scalia (joined by Chief Justice Rehnquist), expressed his disagreement that the First Amendment "refer[s] to the purposes for which legislators enact laws," but instead should focus only on "the effects of the laws enacted." *Id.* at 558. Justice Scalia noted that "it is virtually impossible to determine the singular 'motive' of a collective body, and this Court has a long tradition of refraining from such inquiries. *Id.*

56

because it concerned the particular context of "an adjudicatory body deciding a particular case," rather than a legislature acting as a legislative body to enact laws. *Masterpiece Cakeshop*, 508 U.S. at 636. In this light, the Supreme Court reasoned that "the record here demonstrates that the Commission's consideration of [the owner's] case was neither tolerant nor respectful of [the owner's] religious beliefs," but "gave every appearance of adjudicating [the owner's] religious objection based on a negative normative evaluation of the particular justification for his objection and the religious grounds for it." *Id.* at 639. The Supreme Court concluded that the owner's "religious objection was not considered with the neutrality that the Free Exercise Clause requires." *Id.*

After *Masterpiece Cakeshop*, some courts in similar contexts have recognized the limitations and "unreliability" of legislative history and relying on statements by a single lawmaker to "establish a singular motive behind" an enacted law. *Gaylor v. Mnuchin*, 919 F.3d 420, 430-31 (7th Cir. 2019) (rejecting argument in the context of an establishment-clause claim that a proffered secular purpose offered by the U.S. Treasury Department is a "sham" based on a singular statement by a sponsoring representative in light of other statements made by the same representative as well as statements by other representatives with different motives); *see Dobbs*, 597 U.S. at 253-54 (recognizing that "[t]his Court has long disfavored arguments based on alleged legislative motives [in considering rights conferred under the Constitution]" and has "been reluctant to attribute [legislative] motives [indicated by statements made by legislators who voted for a law] to the legislative body as a whole," because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it") (internal quotation marks omitted).

Here, even assuming that the statements alleged to have been made by the sponsoring Jackson County legislator rise to the same level of the statements made in *Masterpiece Cakeshop* (and *Hialeah*, *see* 508 U.S. at 540-42), the Court is not persuaded that statements by a single county legislator[40] alone plausibly states a claim that the Jackson County Counseling Ordinance was enacted with its "object the suppression of religion," *Hialeah*, 508 U.S. at 542, or was enacted

_____

[40] The Court takes judicial notice that the Jackson County Legislature consists of nine legislators. *See* County Legislature, JACKSON CNTY., MO., https://www.jacksongov.org/Government/County-Legislature#section-1.

57

because of "a clear and impermissible hostility toward . . . sincere religious beliefs . . . ," *Masterpiece Cakeshop*, 584 U.S. at 634.

As to Counselor Plaintiffs' latter argument, "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct tfhat undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) (citing *Hialeah*, 508 U.S. at 542-46). If an ordinance is substantially underinclusive for the asserted interests to the extent it "fail[s] to prohibit nonreligious conduct that endangers [the asserted] interests in a similar or greater degree than [the burdened religious practice]," the Free Exercise Clause may be violated. *Hialeah*, 508 U.S. at 543. In *Hialeah*, for example, the Supreme Court considered a free-exercise challenge to a city ordinance that prohibited religious animal sacrifice. The Supreme Court found that the ordinance was substantially underinclusive as to the asserted governmental interests in protecting the public health and preventing cruelty to animals to the extent the challenged ordinances "forbid few killings but those occasioned by religious sacrifice." *Id.* at 543 (recognizing, as well, that "[m]any types of animal deaths or kills for nonreligious reasons are either not prohibited or approved by express provision").

Counselor Plaintiffs suggest that the Counseling Ordinances are not generally applicable because they do not restrict "conversion therapy" if it is provided for free or by an unlicensed provider, among other exemptions. (Doc. 31 at 29.) "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," in that "[c]omparability is concerned with the risks various activities pose, not the reasons why people [engage in them]." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (granting injunction pending appeal); *see Hialeah*, 508 U.S. at 543 (finding that ordinance prohibiting religious animal sacrifice was underinclusive "for [the] ends" of "protecting the public health and preventing cruelty to animals").

In *Tandon*, for example, the Supreme Court found that the plaintiffs were likely to succeed on the merits of their claim that California's COVID-19 restrictions as applied to prohibit at-home religious gatherings likely violated the Free Exercise Clause because the state "treats some comparable secular activities more favorably than at-home religious exercise, permitting hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring together more than three households at a time." *Id.* at 63. Similarly, in *Hialeah*, the Supreme Court found that the animal-sacrifice ordinance was

underinclusive (and thus not generally applicable) because the ordinances "fail to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than [religious] sacrifice does."  508 U.S. at 543.  As an additional example, in *Kennedy v. Bremerton School District*, the Supreme Court found that applying the school district's policies requiring coaches to supervise student-athletes after games was "not applied in an evenhanded, across-the-board way" and failed the general-applicability test, because while the policy was applied to prohibit the coach-plaintiff from briefly praying on the 50-yard-line after each game, "[t]he [school] district permitted other members of the coaching staff to forgo supervising students briefly after the game to do things like visit with friends or take personal phone calls."  597 U.S. at 526.

Counselor Plaintiffs' argument that the Counseling Ordinances are not generally applicable misses the mark because it erroneously focuses on the reasons *why* people would (or would not) engage in conversion therapy rather than whether the ordinances are underinclusive by permitting *secular* conduct that endangers the government's stated interests to a similar or greater degree than does the concerned *religious* conduct.  In other words, while the Counseling Ordinances may in some sense be underinclusive to the extent the ordinances do not prohibit conversion therapy if it is provided to a minor at no cost or is provided by a person who is not a licensed professional counselor (or by a person who is not acting in their capacity as a professional licensed counselor), for example, the Court is not persuaded that Counselor Plaintiffs have shown that they are underinclusive in the relevant sense.  *See Emilee Carpenter, LLC v. James*, 107 F.4th 92, 110-11 (2d Cir. 2024) (rejecting free-exercise argument that public accommodations law as applied to photography business to require wedding-photography services be provided to same-sex couples contrary to photographer's religious beliefs was not generally applicable in that the public accommodations law permits sex discrimination "based on bona fide considerations of public policy" because "the religious conduct that [photographer-plaintiff] seeks to engage in is not 'comparable' to any sex-based discrimination justified by bona fide public policy reasons" and that the public policy exception to state discrimination "[d]oes not undermine the government's asserted interest in prohibiting sexual orientation discrimination in a similar way" as the conduct the photographer-plaintiff "seeks to engage in").

Counselor Plaintiffs' free-exercise theory appears to rely on the proposition that practicing conversion therapy or providing conversion therapy is their religiously-motivated conduct or is a practice or exercise of their religious beliefs.  (Doc. 1 at ¶¶ 363, 371.)  In this regard, though, the

59

Court notes that the Supreme Court has rejected the theory that "when otherwise prohibitable conduct [under a neutral and generally applicable law] is accompanied by religious convictions, . . . the conduct itself must be free from governmental regulation." *Smith*, 494 U.S. at 882 ("We have never held that, and decline to do so now."). In other words, an "incidental burden[] on religion [is] usually not enough to make out a free exercise claim." *New Doe Child #1*, 901 F.3d at 1025. Here, the Counseling Ordinances appear to be applied in an evenhanded, across-the-board way in that they prohibit licensed professional counselors (indeed, all licensed health providers) from providing conversion therapy to minors for pay as part of their professional counseling practice notwithstanding any reason or motivation the counselor may otherwise have—whether religious or secular—to provide conversion therapy. *See Doe v. Parson*, 368 F. Supp. 3d 1345, 1353 (E.D. Mo. Feb. 21, 2019) (finding that state informed-consent law was generally applicable "because they are applied to *every* woman who seeks an abortion in Missouri, not just members of the Satanic Temple"); *Mayle v. United States*, 891 F.3d 680, 686 (7th Cir. 2018) (holding that plaintiff failed to state free-exercise claim to federal law authorizing the placement of the motto "In God We Trust," on U.S. currency, in part because "[t]he motto appears on all currency . . . which means that [the] law in question is generally applicable") (favorably cited by the Eighth Circuit in *New Doe Child #1*).

As explained above in §IV.A.1, the Court finds that the Counseling Ordinances satisfy the low bar of rational basis review that applies here. The Court finds that Counselor Plaintiffs fail to state a claim that the Counseling Ordinances are unconstitutional under the Free Exercise Clause of the First Amendment. Accordingly, Count 3 is dismissed.

### C. Constitutional Vagueness and Overbreadth Challenges to Counseling Ordinances (Count 5)

Finally, the City seeks dismissal of Counselor Plaintiffs' vagueness and overbreadth challenges to the Counseling Ordinances. (*See* Doc. 20 at 29-30 (referring only to conversion therapy laws).) As set forth in § III.C.1, above, the Court agrees that the Counseling Ordinances are not unconstitutionally vague. As to overbreadth,[41] the parties pay extremely short shrift to this constitutional claim. Defendants for their part refer vaguely to precedent rejecting "similar challenges brought against conversion therapy laws on vagueness and overbreadth grounds," but

---

[41] The Court notes that Counselor Plaintiffs did not seek preliminary injunctive relief to the extent the Counseling Ordinances are overbroad.

provides no further legal analysis or reasoning to support its argument that the Counseling Ordinances are not overbroad. (*Id.* at 29-30.) Counselor Plaintiffs, in response, argue that the Counseling Ordinances are overbroad because (1) "[t]hey ban 'a substantial amount of expressive activity,' including consensual and helpful conversations between counselors and their clients," and (2) "they ban speech based on its viewpoint," which a finding of overbreadth is accordingly "nearly automatic." (Doc. 31 at 33 (quoting *United States v. Williams*, 553 U.S. 285, 287, 293 (2008).)

Under the constitutional overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292. To be unconstitutional, an overbroad statute must be "substantial[ly]" so; ultimately, the question is whether a statute or law as properly construed prohibits "a substantial amount of protected expressive activity." *Id.* at 292, 297. *See also Vill. of Hoffman Estates v. Flipside, Hoffman Estate, Inc.*, 455 U.S. 489, 494 (1982) (in an overbreadth challenge, the question is "whether the enactment reaches a substantial amount of constitutionally protected conduct"). As set out above, the Counseling Ordinances prohibit the practice of conversion therapy, that is counseling to change a minor's sexual orientation or gender identity. The Court finds that counseling (whether as a noun or a verb) is not protected speech under the First Amendment. Therefore, the Court finds that the Counseling Ordinances are not unconstitutionally overbroad. Counselor Plaintiffs present no substantive overbreadth argument otherwise. *See also Langford v. City of St. Louis*, 3 F.4th 1054, 1058 (8th Cir. 2021) (recognizing that "[t]he concern [of the constitutional overbreadth doctrine] with chilling protected speech, however, diminishes as the behavior at issue moves from 'pure speech' toward 'conduct,'" such that "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)'" (quoting *Virginia v. Hicks*, 539 U.S. 113, 124 (2003)). Accordingly, Count 5 is dismissed.[42]

---

[42] Similar to Count 4, the Court notes that Defendants present no substantive argument and do not specifically address Counselor Plaintiffs' similar vagueness and overbreadth challenge to the Public Accommodation Ordinances' Unwelcome Clause asserted in Count 6. At most, Defendants suggest in section headings—without any specific legal analysis—that this claim should be dismissed. (*See* Doc. 20 at 31.) Therefore, the Court does not construe Defendants' motion to dismiss as asserting that Count 6 fails to state a claim. And indeed, to the extent Counselor Plaintiffs address Count 6 in their briefing, Defendants' reply brief in support of their motion to dismiss is wholly silent in this regard. Simply put, the Court will not construe a party as moving for any specific relief for which it provides no substantive argument or legal analysis. *See also* Local Rule 7.0(a) (requiring that "[a] written motion *must* be supported . . . with

### D. Conclusion

Accordingly, as set out above, Count 1, Count 2 (only as to Counselor Plaintiffs' free-speech challenge to the Public Accommodation Ordinance as-applied to their counseling services), Count 3, and Count 5 are dismissed. The Court does not construe Defendants' motion to dismiss as including any substantive argument that Counts 4 and 6 should similarly be dismissed for failure to state a claim.

### Conclusion

Therefore, after careful consideration and review, and for all the reasons explained above, the Court **ORDERS** that:

First, Defendants' motion to stay is **DENIED**.

Second, Defendants' motion to dismiss is **GRANTED in part** as to lack of Article III standing of Plaintiff State of Missouri. The State of Missouri is accordingly **DISMISSED** as a party plaintiff. Defendants' motion to dismiss is **DENIED in part** as to lack of Article III standing of Counselor Plaintiffs.

Third, Counselor Plaintiffs' motion for preliminary injunction is **GRANTED in part** as to Count 2, only as asserting a free-speech challenge to the Public Accommodation Ordinance *regarding pronoun usage*. Accordingly, the Court **FURTHER ORDERS** that the City of Kansas City, Missouri, is **PRELIMINARILY ENJOINED** from investigating, enforcing, or taking any action under the City's Public Accommodation Ordinance against or concerning Counselor Plaintiffs relating to (1) Counselor Plaintiffs' use of pronouns in communicating with clients, prospective clients, or the general public, and (2) Counselor Plaintiffs' publication of any written or printed communication, notice, or advertisement regarding their use of pronouns. Plaintiffs' motion for preliminary injunction is otherwise **DENIED**.

Fourth, Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part**. As to Count 2, Defendants' motion is **DENIED** as to the free-speech challenge to the Public Accommodation Ordinance *regarding pronoun usage*. Defendants' motion to dismiss is **GRANTED** as to all aspects of Count 1, Count 3, and Count 5; **GRANTED in part** as to the free-speech challenge to the Public Accommodation Ordinance *regarding counseling services* of Count 2. These claims are **DISMISSED with prejudice** for failure to state a constitutional violation.

---

suggestions, which are a written brief containing *relevant facts and applicable law*" (emphasis added)).

Thus, at this juncture, the following claims remain: Count 2 (free-speech challenge to the Public Accommodation Ordinance as to pronoun usage), Count 4 (free-exercise challenge to the Public Accommodation Ordinance), and Count 6 (vagueness and overbreadth challenge to the Public Accommodation Ordinance's Unwelcome Clause).

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: July 10, 2025